John N. BEGAY, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Phillip ANDERSON, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. Civ. 80–982 Pct. WPC, Civ.
81–1057 Pct. WPC.

United States District Court,
D. Arizona.

July 10, 1984.

As Amended July 16, 1984.

Stewart L. Udall, William P. Mahoney, Jr., Gilbert T. Venable, Phoenix, Ariz., Albert Hale, Window Rock, Ariz., Thomas S. Udall, Santa Fe, N.M., for plaintiffs.

A. Melvin McDonald, U.S. Atty., James Loss, Asst. U.S. Atty., Phoenix, Ariz., Paul Figley, Trial Atty., Torts Branch, U.S. Dept. of Justice, I. Avrum Fingeret, Edward Jiran, Laura Rockwood, Trial Attys., U.S. Dept. of Energy, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

COPPLE, Senior District Judge.

### BACKGROUND

The controversy involved in these two consolidated cases can be said to have had its first stirrings almost five hundred years ago in two small isolated villages in Europe.

In 1952 an Interim Report of a Health Study of the Uranium Mines and Mills by the Federal Security Agency, Public Health Service, the Division of Occupational Health and the Colorado State Department of Public Health (Def.Ex. 118) summed up the "European Experience":

> In the mines of the Erz Mountains, on both the Bohemian and Saxon sides, it has been known for centuries that the miners die in the prime of life with symp-

toms of damaged lungs and rapidly progressing ill health. These conditions, especially well known at the Schneeberg mines in Saxony, have been mentioned or described by many writers, including Agricola in 1500, Matthesius in 1559, and Pansa in 1814. It was not until 1879, however, that certain European investigators, through clinical and anatomical research, proved the affliction to be a malignant tumor of the lungs.

On the Bohemian side of the Erz Mountains in Czechoslavakia, about 30 kilometers south and east of Schneeberg, is Jachymov. This small mining town of about 8,000 inhabitants has been world famous as a source of radium from the beginning of the present century, but the history of the mines dates from the 1500's. Early in 1516, rich veins of silver were found in the Jachymov area. Exploitation was then begun but owing to the wasteful methods of mining at that time, the veins were almost exhausted by the end of the 16th century. Later, these mines were exploited for cobalt, nickel, bismuth, and arsenic. In the second half of the 19th century the exploitation began of uranium ore, found chiefly in the form of pitchblende. After Madam Curie's discovery of radium, the pitchblende in the Jachymov mines was processed for radium.

In Jachymov, as in Schneeberg, there has been a high mortality among the miners from pulmonary diseases, notably lung cancer. The similarity between the diseases developed by the miners in these two mining areas was not definitely established until about 1926. Environmental studies have shown that both mines have rather high concentrations of radon because of the presence of radioactive ores.

The causative agent for the lung cancers in these two mining areas has been controversial for a number of years. The etiological agent has been variously attributed to be cobalt, nickel, or arsenic. Others have expressed the view that radon and its decay products are responsible for the cancer of the lungs. It is probable, however, that no single agent can be blamed for this high incidence but a number of combined effects of environmental factors which are difficult to evaluate.

Information available in the medical literature of this country indicates there was an attack rate of about 1 percent per year of lung carcinoma among the miners working in these mines. It is also reported that 50 to 70 percent of all the deaths of the workers in these mines were due to a primary cancer of the respiratory system. This information was the only material available which indicated the health hazards associated with uranium mining.... It must be pointed out, however, that this disease usually has developed only after an average exposure of seventeen years. Moreover, in any attempt to use these findings as a guide, cognizance must be taken of the fact that, in contrast to European practices, American operations are more intermittent. According to the Atomic Energy Commission, generally only one shift is employed, and the mines are not worked on a round-the-clock basis.

Also quoting from defendants' Exhibit 118 as to Radon, its Biological and Physical Properties:

Uranium ores contain uranium plus all the other members of the radioactive family, of which uranium is the parent. Included in this list is radium, which is transformed into radon gas.

Radon is the heaviest gas known, being about seven times as dense as air. It is absolutely inert chemically and will react with no other material. As it is a gas, it will diffuse from the rocks or be released by drilling and blasting operations and will become dispersed throughout the atmosphere of the mine. It is radioactive and has a half life of about four days, which means that in this period of time one-half of the radon will transmute into other radioactive elements.

The radiation hazard involved in the mining of uranium ores comes from the radioactive gas, radon, and two of its most important daughters, RaA and RaC[1]. All of these elements emit alpha particles which are very energetic and will damage body cells with which they interact.

As radon is a gas, it is breathed in along with the air in the mine and while in the lungs will continue to decay, emitting alpha particles and producing RaA, RaB, RaC, and RaC[1]. The daughters of radon will also decay in the lungs, likewise emitting alpha particles besides gamma and beta. Furthermore, some of the radon enters the blood stream. Potential hazard to the lung tissue arises mainly from the alphas from Rn, RaA, and RaC[1].

Under usual mine conditions, large numbers of dust particles and water droplets are present in the atmosphere to which the solid decay products of radon will become attached. This dust will be inhaled and carried into the lungs where a portion of it will be retained and decay as outlined above, thus delivering additional radiation to the lungs. The amount of this dust-borne radioactivity that is present in mine atmospheres will depend on the ventilation, air turbulence, and probably other factors.

Case No. Civ. 80–982 Pct. WPC was filed in 1980 with ultimately 144 plaintiffs. In 1981 case No. Civ. 81–1057 Pct. WPC was filed with 61 plaintiffs. These cases were consolidated for all further proceedings. All plaintiffs are Navajo Indians residing on the reservation in Arizona. They are either Navajo miners who formerly worked in the underground uranium mines in Utah, Colorado, New Mexico and Arizona, both on and off the Navajo reservation, or survivors of such deceased Navajo uranium miners.

This trial involved eleven miners or their survivors, as a representative group, selected from Civ. 80–982, to-wit:

Zane Gray

James Garnenez

Horace Ben

Dan T. Benally

Roy Bekis

Roy Benally

Lee C. Coty

Clarence Frank

Will Tuni

Kee Yazzie

Robert Yazzie

Plaintiffs allege jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* The identical claims are based on injuries allegedly caused by excess exposure to ionizing radiation in the uranium mines from 1948 through 1961. Plaintiffs allege various legal theories in support of their complaints and the government asserts various defenses which will be discussed later in this opinion.

For easy reference and identification of abbreviations used hereinafter, a Glossary of Abbreviations is attached as Appendix A.

## FINDINGS OF FACT

Because the facts and chronology of relevant acts and events are largely undisputed, the court has borrowed liberally from the government's very detailed and complete statements contained in its proposed findings of facts. Also see the court's tentative findings and conclusions as summarized at the end of the trial. (Tr. 2233–2248) The legal consequences flowing from those acts and events are very much in dispute.

Mining of uranium-vanadian bearing ores in the United States began at the turn of the century in the Uravan Mineral Belt portion of the Colorado Plateau in western Colorado and Eastern Utah. The ores were first mined for uranium for use as a ceramic coloring agent and for radium, which is associated with uranium. Most of the mines were closed in 1923 because of competition from foreign sources of higher grade radium. In the 1930's, mining was resumed, this time for vanadium. The relatively small domestic supply of uranium obtained for the nuclear weapons devel-

oped by the Manhattan Project was derived from vanadium mill tailings. Mining of uranium for AEC use started in the late 1940's and grew rapidly during the 1950's. For example, in 1950, about 650,000 pounds of uranium oxide were purchased and in 1959, over 30 million pounds were purchased. (Pl.Ex. 115, pp. 155–156) Contraction in the industry began when demand reduced in 1956. Many mines closed and the size of the industry steadily decreased. (Pl.Ex. 115, pp. 157–158)

There was a wide range in the size of individual uranium mines and in the types of mines in the various states. Wyoming had a large number of small mines mainly underground. New Mexico developed most of the large underground mines, but also the largest open pit mine. A comparatively few large mines produced most of the ore. (Pl.Ex. 115, p. 156)

Size of the work forces varied as widely as the size of the mines. A comparatively few large mines employed most of the underground labor. In the mid-1960's, New Mexico mines employed about one-half of all uranium miners, although they represented only 5 percent of the total number of uranium mines. Mines in Colorado and Utah employed less than 8 percent of the miners, although they represented about 50 percent of the total number of uranium mines at that time. (Pl.Ex. 115, p. 156) There were only 12 to 20 mines, small in size, located on the Navajo reservation, contrasted to more than 500 uranium mines overall. (Tr. 1884, 1885; Pl.Ex. 115, p. 232, 248)

Few uranium mines were large as compared with the size of other types of metal mines. Nevertheless, by 1966, approximately 2,900 miners were employed in the uranium mines. (Pl.Ex. 115, p. 156) Mining of uranium involved mining methods and equipment and hazards similar to those in other mines. (Pl.Ex. 115, p. 247) As with all types of mining, workforce turnover and accident rates were generally higher than in other industries. Miners, especially in the small mines, moved from mine to mine, and from mining to other occupations. Many were part-time miners. (Pl.Ex. 115, p. 157)

In August, 1949, when the industry in Colorado had expanded substantially and was producing sizable quantities of uranium ore, officials of the Colorado Department of Health and the Colorado Bureau of Mines appointed an advisory board to assist in developing procedures to be used in conducting studies and surveys in the uranium mining and milling industry. Among the conclusions reached at the first meeting of the advisory group were that not enough was known of the potential health hazards from radiation in the uranium producing industry, and that a medical/environmental survey should be made by a physician from the U.S. Public Health Service (PHS). An initial survey of the mines was conducted to determine their radiation levels. Subsequent to this initial survey, a second meeting of the advisory group was convened with representatives of the large mining companies of Colorado. It was decided at this meeting that because of the absence of sufficient available information on the health hazards from radiation associated with the uranium producing industry, PHS should be formally requested to conduct a study of the uranium mines and mills to assess whether health hazards existed, and if so, to determine the nature and magnitude of such hazards, and to assist the states and mining companies in developing control procedures. This request was prepared and formally submitted to the Surgeon General of the United States on August 30, 1949. Shortly thereafter, PHS responded that it was willing to conduct the study requested. (Def.Ex. 482, pp. 1–2; Tr. 1894, 1925; Pl.Ex. 115, pp. 100, 171, 318; Def.Ex. 3306; Pl.Ex. 3; Pre-Trial Order, Stip. 31)

During initial negotiations for planning the health study, the PHS conducted a limited study of the problems in mines located on the Navajo reservation. The preliminary information indicated that the miners were exposed to very high external radiation, radon gas, and high silicate dust con-

taining an undetermined amount of radiation. (Pl.Ex. 3)

One purpose of the epidemiological study was to determine whether there was any reason to believe that the European experience in the Schneeberg and Joachimsthal mines would be repeated in the United States. Another purpose of the study was to attempt to control atmospheric conditions in mines. (Tr. 2029)

At the inception of the PHS study, there was not unanimity among the scientific community as to the causes of lung diseases of miners at the Joachimsthal and Schneeberg mines. In fact, respected members of the scientific community considered that other minerals such as arsenic and cobalt were involved in the cancers of the miners from Joachimsthal and Schneeberg. (Tr. 1038, 2073)

At the inception of the PHS study, it was decided by the study advisory committee that the study would consist of two phases: a medical investigation and an environmental investigation. With respect to the medical investigation, the original concept of the study was to examine all uranium millers and underground miners annually to obtain biologic, social and occupational data. Physicians would give each individual a general physical examination, a chest x-ray would be taken, and blood and urine analyses would be performed. This practice was continued in 1950, 1951 and 1953 when, for a variety of reasons, it was decided to shift to examinations on a triennial basis. The triennial examinations were continued until 1960. (Pl.Ex. 115, p. 101; Pl.Ex. 3; Pre-Trial Order, Stip. 1; Tr. 437; Pl.Ex. 3)

The PHS study of uranium mines was planned with two primary objectives. One was to determine the relationship between exposures to radioactivity and the biologic effect on the miners. A second objective was to develop engineering methods to minimize the exposures to radioactivity and make those methods available to the state mine regulators and to the mining industry. (Pl.Ex. 115, p. 100)

To assist in the design and execution of the study, PHS requested and received cooperation and assistance from the Atomic Energy Commission (AEC) Division of Biology and Medicine, the U.S. Department of Interior, Bureau of Mines (BOM), the Los Alamos Scientific Laboratory and the Atomic Energy Project of the University of Rochester. (Pl.Ex. 115, pp. 100–101)

With the advice of these agencies, the protocol for the study was designed, determining: who and what would be studied, for what period of time, and how the study would be conducted.

At all times relevant to this action, no federal agency had a right to enter uranium mines located on private property and regulated by the states. (Def.Ex. 1718, p. 17; Tr. 1882–1885, 1895, 1930, 1935, 1978–1979; Def.Ex. 32, p. 43; Pl.Ex. 115, p. 247) PHS had no authority to enter privately operated mines on the Navajo Indian reservation for the purpose of conducting environmental studies relating to silica dust and radiation levels, or to conduct physical examination of the miners. In order to proceed with the epidemiological study, it was necessary to obtain the consent and voluntary cooperation of all mine operators. To do this, it was decided by PHS under the Surgeon General that the individual miners would not be told of possible potential hazards from radiation in the mines for fear that many miners would quit and others would be difficult to secure because of fear of cancer. This would seriously interrupt badly needed production of uranium. While statistical information as to the environmental and medical data obtained could be released, no individual mine or mines would be publicly identified in connection with that data. Consequently, the voluntary consent of mine operators was secured to conduct the PHS study. (Tr. 113–117, 126, 2044–2046)

At all times relevant to this action PHS was a part of the U.S. Department of Health, Education and Welfare (HEW) under the direct administration of the Surgeon General of the United States, and has never had authority to regulate health and

safety conditions in mines. (Tr. 1927; Def.Ex. 2318, p. 4)

The uranium miners' study by PHS was a prospective epidemiological study in which a cohort of miners was established and followed for an indefinite period of time. (Tr. 435–436) The study was designed to begin simultaneously to obtain environmental measurements of concentrations of radon in uranium mines and to conduct physical examinations among uranium miners, to be repeated at intervals to determine whether or not there were changing health effects observed in the miners over time. (Tr. 2029) The purposes of the medical examinations were to see if there were any findings that could reflect exposure to radiation and to create the cohort. (Tr. 1042) One of the considerations of the physical examinations was to induce the miners to volunteer for examination so that background information could be obtained for the study. (Tr. 1043)

Under the PHS study protocol, the results of the examinations were to be sent to the miner's physician and to the miner himself. (Tr. 2061) The protocol did not provide for medical treatment or care for miners. On the contrary, the plan for the study provided that miners would be notified of abnormal findings in the test results and advised to see their treating physicians. From time to time, for a variety of reasons, the protocol for the study was altered. (Pl.Ex. 115, p. 101; Def.Ex. 180, pp. 9–10; Def.Ex. 6, p. 5; Tr. 106, 165–171, 1042, 1055)

The physical examinations were conducted at all uranium mining areas including the Navajo reservation, by medical and technical teams. (Tr. 448, 449, 450) If there were suspicious test results for a miner, the miner was referred to local medical facilities or to treating physicians for diagnostic studies and/or treatment. At no time did PHS attempt to undertake or to represent that it would undertake the health care of the members of the study group. (Tr. 1044–1048; Def.Ex. 183–187; Def.Ex. 6, p. 5; Def.Ex. 2291 and 2292)

All Indians with significant abnormalities of any kind were informed of the findings and when indicated were advised to seek medical care at one of the Indian Service hospitals. Reports on all significant abnormal findings were forwarded to the Indian hospital at Fort Defiance, either to Dr. Margolus or to Dr. Organick.

Physical examinations were conducted in conformity with the medical examination standards existing between 1950 and 1961. (Tr. 1043) The x-rays that were taken conformed to the standards in accepted medical practices existing in the 1950's. (Tr. 1043–1044)

The physicians conducting the medical examinations did not treat the miners examined for past medical conditions, for conditions observed during the course of the examination, and did not provide follow-up treatment to the persons examined for any conditions observed during the course of the examination. (Tr. 1044; See also FF 15) The PHS referred the persons examined to their private physicians or, in the case of Navajo miners, to the PHS Indian Hospital for follow-up treatment. (Tr. 1044)

During the course of the examination, the Navajo miners were told that the examination was part of a study of the health of uranium miners. (Tr. 451) Each miner was notified of any condition observed during the course of the physical examination. Where Navajo miners were involved, the results of the physical examinations also were sent to the Indian Health Service Hospital. (Tr. 508, 1044–1046)

During the course of the medical examinations, interpreters were used for non-English speaking Navajo miners. Interpreters were needed primarily for obtaining occupational and medical histories of the persons examined. (Tr. 1049–1050) Where a history was obtained of a non-English speaking Navajo, an interpreter was used. (Tr. 1050)

For the 1954, 1957 and 1960 physical examinations, the miners signed consent forms. By signing the consent forms, the miner requested that any significant abnor-

mal findings be reported to his personal physician. (Tr. 452–453, 507) There was no consent form used in connection with the 1950 examination. Because of the voluntary nature of the examination, however, the miner impliedly gave consent for such examination and for release of the information to his physician. (Tr. 2049) The examination and consent forms utilized as part of the epidemiological study were consistent with the standards for epidemiological studies in the 1950's to early 1960's. (Tr. 2038)

The primary reason for discontinuation of physical examinations in 1960 was the development of a new diagnostic process, sputum cytology. It was decided that the application of this diagnostic procedure to the uranium mining population would be more meaningful than physical examinations. The process of sputum cytology consists of a microscopic pathological examination of sputum cells which, to the expertly trained eye, will reveal early indications of the development in the respiratory system of deformed cells which are the precursor of cancer. Sputum samples have been collected from miners on an annual basis since 1960 and are still being collected today. (Pl.Ex. 115, p. 101; Tr. 1529)

In the design of an epidemiological study generally, there is a specific set of objectives set forth in a protocol. Here there was no objective and, indeed, it was not part of the protocol, to educate miners as to the hazards of uranium mining. (Tr. 2085–2086, 2078)

The physicians conducting the medical examinations had the responsibility for dealing only with the examination and the results of that examination. Therefore, it was neither necessary nor proper for those physicians to advise the miners voluntarily appearing for examinations of potential hazards in uranium mines. (Tr. 2042–2043)

During the course of the uranium miner study, employees of the United States were attempting to achieve lower concentrations of radon daughters in underground uranium mines through education of the mine operators. (Tr. 1056; See also FF 23)

There was no risk to the miner examined in the course of the physical examinations, and, on the contrary, there was a benefit to be derived by the individual miner. The minimal risk due to the chest x-ray was greatly exceeded by the benefit to the miner in determining if there were pulmonary lesions. There was further benefit to be derived by having a personal physician, or in the case of a Navajo, the PHS Indian Hospital, notified of any positive findings from the physical examinations. (Tr. 2042, 2043)

A physician is ethically bound to be truthful in what he tells a person being examined about the results of the examination. Accordingly, the PHS physicians examining the uranium miners reported to each miner any adverse indications found in the course of his examination and informed the miner that the results of the examination would be sent to his private physician or to the PHS Hospital on the Indian reservation. (Tr. 2051)

An epidemiological study deals with group statistics and the conclusions of such a study appropriately cannot be applied to specific participants of a group. (Tr. 2054–2055) The PHS study was designed to study persons already engaged in the mining industry. The government did not seek volunteers to work in the mines so that they could become part of the study group or cohort. (Tr. 1054, 1055)

The miners who were members of the study group were not recruited by the federal government to work in mines or to be placed in a particular mine atmosphere. (Tr. 2050, 2051) Employees of the United States neither caused the underground uranium miners to be exposed to any deleterious substance nor withheld treatment from any individual. (Tr. 1056–1057)

The PHS epidemiological study protocol and the conduct of the PHS physicians participating in the study and the limits on the information given to the miners studied were consistent with the medical ethical and legal standards of the 1940's and 1950's. It was not until the 1964 and 1965

period that federal guidelines were established for the conduct of federally-funded research projects. This followed discussions in the legal community, the medical community and congressional hearings after the Nuremberg trials of Nazi war criminals engaged in human experimentation in the German concentration camps. (Tr. 2075–2087) The PHS physicians here were not experimenting on human beings. They were gathering data to be used for the establishment of enforceable maximum standards of radiation exposure in uranium mines.

To collect mortality data on the study of the 3,415 miners with underground experience, it was necessary to maintain contact with the individuals. This was accomplished through an annual census of the uranium mining industry by newspaper obituaries and by mail questionnaires. Attempts were made to trace unaccounted for individuals through the U.S. Postal Department, Social Security Administration, employment offices, vital statistic records, credit bureaus, and the Veteran's Administration. A final means of ascertaining death and disability was through claims to the Bureau of Old-Age and Survivors Insurance. Through these follow-up efforts contact was maintained with 95% of the original study group. (Pl.Ex. 115, p. 101–102; Def.Ex. 182 and 2997)

The environmental investigation consisted of determining the levels of radon, radon daughters, and silica in the various mines. (Pl.Ex. 3) In the initial years of the environmental investigation in the mines, Colorado State employees conducted the surveys, which were funded by a grant from the National Cancer Institute of PHS. AEC supplied equipment and logistical support. (Tr. 1896, 1987) Although AEC could not allocate funds to state governments to assist in conducting the miners' study (Def.Ex. 32, p. 63), it could and did contribute personnel and equipment and the facilities of AEC to assist PHS and the states in collecting, measuring and analyzing data. (Tr. 1538–1539, 1896; Def.Ex. 2305, p. 4, para. 6–7)

AEC was especially active in providing assistance to the states and mine operators in ventilation techniques. As early as 1952, AEC began experimenting with mine ventilation techniques to reduce radon concentrations. (Tr. 1575, 1896; Pl.Ex. 150, p. 30)

Prior to 1951, all radiation measurements and studies of the biological effects of radon were based on the assumption that the significant alpha-particle energy was delivered to the lungs by the decay of radon in the respiratory tract. In 1951, it was recognized that the radiation decay products (daughter products) of radon contributed the greater portion of the radiation dose to the lung tissue. The inhalation of these particulates with their associated radioactivity results in a radiation dose to the lung tissue.

Animal experiments and calculations showed that under conditions similar to those found in mines, the radiation dose from radon gas alone was only 5% or less of the total dose delivered by the radon daughters. It was recognized that if the daughter products could be removed from the air inhaled by the miner, the radiation dose to the lung could be reduced by approximately 95%. (Pl.Ex. 115, p. 142)

Two possible controls of the problem were presented after 1951. First, if the level of radon and radon daughters in the mines could be kept at the lowest possible level, the radioactive exposure to the lungs would be minimized. Mechanical ventilation of the mines was found to be very effective in removing both the radon and daughters. Second, filtration of the air being breathed by the miner to remove the radon daughters was a possibility. However, since the science of protection by air filtration through the use of respirators was not well developed in 1951, the PHS study team determined that greater protection could be secured through adequate mechanical ventilation of mines. (Pl.Ex. 115, p. 142)

As an ancillary activity to its environmental investigation, in 1951, PHS began a series of training courses on the subject of

ventilation to control radon gas and radon daughters. The courses were for the benefit of mining company personnel and state mine regulators. PHS was assisted in this endeavor by BOM and ventilation experts from some of the major mining companies. (Pl.Ex. 115, p. 104; Tr. 166) PHS also conducted an "Occupational Health Program" for the education of mine operators and miners themselves. (Def.Ex. 2315, p. 2; Pl.Ex. 135) Between 1951 and 1955, staff members of PHS held conferences with officials of state mining and health agencies and the management of most of the uranium mining companies to explain the radiation health problems and to recommend control procedures. (Pl.Ex. 115, p. 104; Pl.Ex. 2; Pre-Trial Order, Stip. 37)

The new concept of the relationship between radon daughters in the atmosphere and dose to lung tissue also required the development of improved instrumentation as well as a new standard related to the alpha energy released by the radon daughters instead of radon gas. Although no federal standard existed and no safe level of concentrations had been established by competent authority, the PHS, based on certain evidence, calculated a tentative standard of 300 micro micro curies of total alpha emitting products per liter of air. This value is the equivalent of the term "one working level." (Pl.Ex. 115, p. 142)

AEC sponsored and conducted research for the development of more sensitive and accurate monitoring and measuring equipment to be used during mine inspection activities, human dosimeters which could be worn by miners underground revealing accurate cumulative doses of radiation, and lightweight respiratory devices to be worn by miners underground without inhibiting either their activity or vision so as not to expose them to harm from other non-radiation related mining accidents. (Tr. 1559, 1575–1577; Def.Ex. 2329, pp. 44–45)

After 1952, the PHS conducted no surveys of the environment in uranium mines located on the Navajo reservation. Sampling after that time was conducted by the BOM and subsequently the State of Arizo-

na. (Tr. 115) BOM continued a program of surveying mines on Indian land from 1953–1958. Its findings and recommendations were reported to the U.S. Geological Survey (USGS) for enforcement action. (Pl.Ex. 247; Pl.Ex. 150, p. 30)

In May 1952, the "Interim Report" was published by the PHS to inform mining companies and state and other governmental agencies about the hazards and extent of the problem of radon daughters in underground uranium mines. This report contained recommendations for controlling the high levels of radon daughters in such mines. (Tr. 139–140; Pl.Ex. 3) The Interim Report was widely distributed. (Tr. 190; Def.Ex. 2520)

In 1953, the Joint Committee on Atomic Energy (JCAE) made official inquiries concerning the health and safety conditions in the uranium mines of the Colorado Plateau. (Tr. 1890; Def.Ex. 2309 and 2310)

Employees of the United States and of the various states participated in conducting surveys to determine the level of radon and radon daughters in various mines. State employees surveyed uranium mines for radon in Colorado beginning in 1950. After 1951, mines were surveyed for radon daughter products. In 1952, radon daughter samples were taken by employees of PHS in 157 mines. Through the efforts of Utah inspectors and PHS employees, every uranium mine in that state was surveyed in 1953 and 1954. In New Mexico, state employees had taken over the surveying tasks by 1954. In 1955–1960, PHS limited its participation in radon daughter surveys to assisting the state agencies. In 1955, Arizona began a program to survey every mine. By 1956, most of the large mining companies were surveying the mines which they operated and state employees surveyed the independent mines. In 1959–1960, in addition to all the continuing state programs, Utah conducted another survey of every mine, Colorado did the same and New Mexico instituted a continuous monitoring program. (Pl.Ex. 150, p. 30; Pl.Ex. 50, p. 30) Reports of the surveys were supplied to the mining companies in which

the levels of radon daughters were explained. (Tr. 168, 179–180, 213)

Instrumentation for the purpose of measuring radon daughters in underground uranium mines was available to mining companies in 1951, and some companies had such equipment in 1951 to enable them to make their own measurements. (Tr. 193–194) The PHS calibrated such measuring instruments for the mining companies to ensure their reliability. (Tr. 123)

On March 14, 1954, the PHS issued AECU Bulletin No. 2858 entitled "Control of Radon and its Daughters in Mines by Ventilation." (Pre-Trial Order, Stip. 40) In February 1955, PHS convened the "Seven State Conference on Health Hazards in Uranium Mining," at the request of Utah state mining officials. The conference featured consideration of radon hazards in underground mines and of control methods based on safe working levels advocated by PHS (300 picocuries/liter, or 1 WL). Representatives of seven uranium mining states, PHS, BOM, AEC, mine operators, mining equipment manufacturers, and independent scientific groups and institutions attended the conference. (Pl.Ex. 56, pp. 99–104; Tr. 1575)

BOM accepted the standard recommended by PHS at the Seven States Conference for the purpose of its mine inspections (Pl.Ex. 115, p. 247) and for instructional purposes in its safety education program for miners and mine operators. (Pl.Ex. 115, pp. 232, 248) Inasmuch as PHS had no mine regulatory authority, its informal radiation standard of 1 WL could only be a suggestion to state mine regulators and mine operators. It was incorporated into the mining codes of Colorado, New Mexico, and Utah. (Pl.Ex. 115, pp. 103–104; Def.Ex. 2909; Tr. 1901–1905) AEC adopted the 1 WL standard for enforcement in AEC-leased mines (Tr. 1907–11; Def.Ex. 1258 and 1259).

In 1956, the Research and Development Subcommittee of the Joint Committee on Atomic Energy began an inquiry into radiation hazards. Also in 1956, proposed legislation to authorize BOM to inspect metal and nonmetal mines was considered by the House Committee on Education and Labor at hearings on mine safety. During the course of those hearings, there was testimony relating to the potential health hazard from radiation in uranium mines. [Tr. 1881; See, Hearings before House Committee on Education and Labor, on Mine Safety (84th Cong.) 305 et seq., 488–489; Hearings before House Committee on Education and Labor, on H.R.4111 (85th Cong., 1st Sess.), 37–40, 61].

In 1957, PHS published a bulletin entitled "Control of Radon and Daughters in Uranium Mines and Calculations on Biologic Effects," PHS Publication No. 494. (Pl.Ex. 115, p. 104; Def.Ex. 3006) This bulletin was made available to all uranium mining companies, state health and mining agencies, appropriate federal agencies, the scientific community and others concerned. Publication No. 494 became a handbook for mine inspections, and, among other things, called attention to the potential health problems resulting from exposure to high concentrations of daughter products and summarized the evidence on which the suggested standard of 300 picocuries, or 1 WL, was based. (Def.Ex. 3006, pp. 5–10) It also contained the results of experiments to demonstrate the effectiveness of mechanical ventilation under actual mine conditions and a method for the collection and measurement of the concentration of radon daughters. In addition, the bulletin presented recommendations for controls other than ventilation. (Def.Ex. 3006, pp. 45–74; Tr. 198–200)

In 1957, the excess lung cancers in uranium miners in the United States were not statistically significant. (Tr. 1067, 1068) In 1959, for the first time, epidemiological data resulting from the PHS study seemed to indicate a statistical excess above the number of expected deaths among miners from lung cancer. Although the statistical data were far from conclusive, it was the first apparent evidence linking lung cancer and exposure to high concentrations of radon daughters. (Tr. 1961, 1068–1069, 1970; Def.Ex. 330)

In March 1959, the General Manager of AEC on behalf of the Commissioners suggested to the Surgeon General that an interdepartmental conference be convened to consider what federal action, if any, could be taken to address the uranium mining problem. (Def.Ex. 2991) The Secretary of HEW, with the cooperation of the Chairman of the AEC and the Secretaries of Interior and Labor, appointed an Interagency Committee charged with the responsibility of examining the uranium miners' problem and recommending federal action. The committee met on September 28, 1959, and rendered its report to the Secretary of HEW on November 12, 1959. (Def.Ex. 2319; Tr. 1919 *et seq.*) [1]

The interagency Committee analyzed existing federal responsibilities and found that: the U.S. Department of Interior could inspect mines and enforce health and safety provisions only with respect to mines located on public or Indian lands but not with respect to mines located on private lands; mines were excluded from AEC jurisdiction by the Atomic Energy Act; PHS of the U.S. Department of HEW was limited to research, investigation, and the provision of technical assistance to the states; and, although it had some responsibility under the Public Contracts Act for health and safety in mines owned by milling companies under contract with the United States, the U.S. Department of Labor could not provide the technical assistance to control mine atmospheres. (Tr. 1920–1930; Def.Ex. 2319, pp. 4–5)

The Interagency Committee recommended to the Secretary of HEW "that every effort should be made to impress upon the States the seriousness of this problem and the need to assume their rightful responsibilities" over regulation of mine health and safety conditions. To achieve this goal, the committee recommended that a conference be convened by the Secretary with participation by the U.S. Department of HEW, Interior, Labor and AEC and the governors of the uranium mining states. The Committee specifically recommended against new federal legislation which would preempt the state's traditional police power over the regulation of mine safety. (Tr. 1920–1930; Def.Ex. 2319, p. 5)

The Secretary of HEW adopted the Committee's recommendations and in concert with the Secretary of Interior and the Chairman of the AEC, convened a Conference of Governors of the uranium mining states in December 1960. The attendees included the Secretary of HEW, interested federal agencies, the Governors, state agencies and management representatives of mining companies. (Def.Ex. 2317, 2318, 2319, 2296; Tr. 1920–1924 and 1930–1931) At the Conference, the Secretary of HEW, on behalf of all interested federal agencies, extended a program of assistance to the states encouraging progress toward control of radon daughters. (Def.Ex. 2992)

Notwithstanding the desire of the various uranium mining states to have the technical and financial assistance of the federal agencies in endeavoring to solve the radon daughter problem, it was always clear that the state governments regarded the regulation of mine health and safety as state business. Preemptive federal legislation providing for federal regulation of mine health and safety was something that neither the states nor the federal government desired. (Def.Ex. 32, pp. 42, 43, 57, 67; Tr. 1930)

Prior to 1960, state officials had great difficulty in trying to persuade mine operators and miners that a large volume of ventilation, in some cases at considerable cost, was needed to correct the intangible hazard of radiation. There was no positive evidence at that time that radon gas or its daughter products, which could not be seen, smelled, or tasted, were or could be harmful. (Def.Ex. 32, p. 57; Def.Ex. 6, p. 7; Pl.Ex. 115, p. 318)

The states responded to the Governor's Conference and the offer of federal assistance with an increasingly strong position in

---

1. Transcript of trial does not refer to the Report of the Interagency Committee with a separate exhibit number. The report alone is Defendant's Exhibit 2319.

the regulation of mine safety. (Def.Ex. 2292; Tr. 1932–1935; Pl.Ex. 115, p. 143) Colorado state mining authorities identified hazardous conditions and acted with authority in requiring correction by mine operators beginning in 1960. (Pl.Ex. 115, p. 318; Tr. 1933–1934; Def.Ex. 2292) New Mexico established a standard of 1WL as suggested by PHS and an enforcement program was undertaken to bring mines within the state into compliance with the new regulatory limitations. (Def.Ex. 32, p. 38; Pl.Ex. 115, p. 323; Tr. 1932)

In 1959, subsequent to announcement by PHS of an apparent statistical increase in the incidence of lung cancer in uranium miners, AEC requested BOM to conduct a quarterly inspection of all AEC-leased mines located on land withdrawn by the AEC from the public domain and leased to independent operators. Thus, all AEC-leased mines were routinely inspected for radon concentrations beginning in 1959. Enforcement of control measures was a priority—some mines were closed—and the Chairman, Commissioners and JCAE were kept fully informed of the progress. AEC had concluded that it could enforce health and safety measures in leased mines pursuant to the leasing provisions of the Atomic Energy Act. (42 U.S.C. § 2097) Moreover, AEC required the formal amendment of all such mine leases to contain explicit enforcement language and procedures. (Tr. 1938–1946; Def.Ex. 732; 1498, pp. 29–31; 2263; 2289; 2298; 2300–2304; 2292, p. 5; Pl.Ex. 115, p. 242)

Also in 1959, the President, by executive order, established the Federal Radiation Council (FRC) as a panel of advisors to the President with respect to radiation matters, directly or indirectly affecting health, including guidance for all federal agencies in the formulation of radiation standards and in establishment and execution of programs of cooperation with the states. Soon thereafter, the Congress ratified the President's action, making FRC a creature of statute (P.L. 86–373). The members of the Council were initially the Secretaries of HEW, Labor, Commerce, Defense, Agriculture, and the Chairman of AEC. Later, the Secretary of Interior was added. The President's Special Assistant for Science and Technology was included from the outset as an official consultant to the Council and the Secretary of HEW was designated Chairman. (Tr. 1519–1521)

The earliest agenda of FRC included consideration of radiation hazards to uranium miners and the establishment of a radiation standard for underground mines. (Tr. 1522) In 1960, FRC proposed to the President and obtained his approval of recommendations for the guidance of federal agencies in the conduct of their radiation protection activities applicable to manmade sources of radiation such as nuclear reactors, isotopes and x-rays. These recommendations did not include a standard for uranium mines. In 1959, the President directed that HEW intensify its radiological health efforts and have primary responsibility within the executive branch for the collection, analysis and interpretation of data on environmental radiation levels. (Def.Ex. 629; Tr. 1522)

From approximately 1960–1967, during the FRC's extensive study of the problem of exposure to radon daughters, including a re-evaluation of data contained in the PHS study of uranium miners, the FRC Chairman was critical of the pace of progress by state mine regulators in requiring control of radon concentrations through ventilation. In communications with the Chairman of the AEC, the FRC Chairman indicated his decision to coerce the Governors of the uranium mining states into action by issuing a threat at the 1961 Western Governor's Conference to propose legislation to the Congress for federal authority to preempt state regulatory authority over uranium mines. (Def.Ex. 2285; 2306, pp. 7–8)

In 1959, an additional series of hearings was conducted by JCAE, investigating "Employee Radiation Hazards and Workmen's Compensation." In the Committee summary of the hearings pertinent to radiation hazards in underground uranium mines, testimony revealed opposing views. On the one hand, federal legislation was

suggested to usurp regulation of mine health and safety from the states. On the other hand, federal assistance was suggested to guide the states in carrying out their mine regulatory responsibilities. The Committee staff concluded that more studies were needed to determine a safe low threshold of ionizing radiation, and furthermore, that present data—including PHS data—were inconclusive. The problem was recognized as one which could be resolved only with the application of judgment. (Tr. 1915–1918; Pl.Ex. 41, pp. 1, 4, 6)

However, even in 1960, the only available means of control was to regulate average atmospheric radiation to a point where exposure time to the sample concentration would be as near to the standard for a year's exposure as it was possible to estimate. There was no practical instrument (dosimeter) developed at that time that would actually measure each man's accumulated dose of alpha radiation within a factor of plus or minus 50%. Thus, even with mine enforcement programs in place, precise determination as to individual dose and related hazard was not possible. (Pl.Ex. 115, p. 318; Tr. 1578, 1582; Def.Ex. 2329, p. 46) Notwithstanding these technical difficulties, Colorado's program for the control of radon concentrations in underground mines was enforced and where necessary, mines were closed. (Pl.Ex. 115, p. 323)

In the early 1960's, AEC established a Labor-Management Advisory Committee with members representing the federal government, corporate management, and labor unions. Among the committee's projects was to draft workmen's compensation legislation for proposal by the Commissioners to the Congress, to assure that uranium miners suffering from lung cancer would be reasonably compensated for their injuries. (Tr. 1957; Pl.Ex. 115, p. 179 *et seq.*)

In 1960, BOM developed a new field method for estimating daily exposures of underground uranium miners to airborne radon daughter products. This method became a useful tool, not only for the purposes of inspection by state mining officials, but also for the control efforts of mining companies. (Pl.Ex. 115, p. 247)

In 1961, the Industrial Commission of Utah requested and received cooperation from BOM in making a joint inspection of every operating underground uranium mine in Utah. The purpose of this joint venture was to train state inspectors and to establish a foundation of data on existing uranium mines in the state for guidance of state officials in the future. Fifty-three privately owned mines were inspected under this joint program. (Pl.Ex. 115, p. 247)

In 1961, the Department of Interior was authorized by PL 87–300 to conduct a two-year study into health and safety hazards in metal and non-metallic mines. The Department's report to the Congress in 1963 was the basis of congressional consideration of legislative proposal which ended with enactment of the Metal and Nonmetallic Mine Safety Act of 1966. This Act authorized the Department of Interior to establish uniform standards, including radiation standards for underground mines, and to inspect all mines. (Tr. 1935–1936; Def.Ex. 2289; Tr. 1956) To assist in the study, the Secretary of Interior requested and received the cooperation of the Chairman of the AEC. (Tr. 1936; Def.Ex. 2289) From the outset of its uranium procurement activities, AEC proceeded on the principle that regulation of mine safety was traditionally a responsibility of the individual states and it was especially sensitive to federal impingement of state authority. (Def.Ex. 32, pp. 29, 63; 2990, p. 2; Tr. 1893, 1899, 1929, 1978, 1979).

The AEC did not have regulatory authority over mines located on private land and regulated by the states. However, AEC did have regulatory authority over processing mills, but even that authority was limited to source, byproduct and special nuclear material which were defined by Section 62 of the Atomic Energy Act of 1946, and only to such material "after removal from its place of deposit in nature." Since radium and radon gas (including radon daughter products) as they occurred in the mines

were not covered by the definitions of source, byproduct or special nuclear material, they were not subject to AEC's regulatory authority. Thus, uranium mining was not within AEC's statutory authority. (Pl.Ex. 115, p. 159; Tr. 1536, 1540, 1596, 1882–1883, 1889, 1926, 1929, 1930, 1935)

On a number of occasions, the General Counsel of AEC formally advised the Commissioners that AEC possessed no statutory authority to regulate health and safety in uranium mines located on private land. Furthermore, he advised against any attempt by AEC to regulate such mines. (Tr. 1537–1543; Def.Ex. 2312, 2314)

At all times pertinent to this litigation, the Department of Labor was of the opinion that the Public Contracts Act had clear application to uranium mines which were directly controlled by the uranium mills under procurement contract with the AEC. Independent mines which were not controlled by either the milling or the mining companies that operated the mills were not believed to be covered by the provisions of the Public Contracts Act. (Pl.Ex. 115, p. 47)

AEC contracted only for the purchase of uranium concentrates from the mills, not for the purchase of ore from the mines. (Pl.Ex. 115, p. 157) The AEC contracts for procurement from the mills contained broadly phrased "health and safety" stipulations in accordance with the Public Contracts Act requirements. (Pl.Ex. 115, p. 47) The Secretary of Labor did not promulgate safety and health standards for uranium mining until 1967, and no safety and health inspections of uranium mines were made by Department of Labor inspectors. (Pl.Ex. 115, p. 47)

The reason, as stated by the Secretary of Labor, for not taking action in this area prior to 1967 was that "the general and prevailing view was that other agencies, Federal and state, could more appropriately exercise here both the standard-setting and the inspection functions * * * * The record reflects continuing attention by a variety of state and federal agencies—including the Department of Labor—to both the standards and the inspection problems in connection with uranium mining." (Pl.Ex. 115, p. 47; Def.Ex. 32, p. 76; Tr. 1537–1542, 1926–1927, 1951; Def.Ex. 2312 and 2314) Moreover, it was evident that "instrumentation [was] not [then] commercially available for accurately measuring the concentration of radon daughter products in the ambient mine atmosphere on a continuous or near continuous basis, and that there [was] not ... available any form of personal dosimeter capable of measuring the dose of radon daughter products actually received by a miner." (Pl.Ex. 115, p. 95; Tr. 1567–1572)

In deposition testimony recorded in 1982, ex-Secretary of Labor Willard Wirtz stated that it was not by inadvertence that the Secretary of Labor did not act under the provisions of the Public Contracts Act with respect to uranium mining until 1967. (Wirtz Deposition, pp. 24 et seq., 26–27) Correspondence from the Secretary of Labor to JCAE demonstrates that the Department of Labor was considering promulgation of separate regulations for radiation exposure in uranium mines as early as 1962 but was awaiting the formulation of a standard by FRC. (Def.Ex. 651)

In 1967, Secretary Wirtz published a proposed standard for radon daughter concentrations in underground mines of 0.3WL/liter. Also in 1967, Secretary Wirtz proposed workmen's compensation legislation in an effort to provide for the uranium miners who had not yet but might in the future contract lung cancer. (Def.Ex. 672; Tr. 1957)

On July 27, 1967, the President approved FRC's proposal for a uniform federal radiation standard for underground uranium mines. (Tr. 1555–1559; Def.Ex. 414; 507) Notwithstanding the absence of a federal radiation standard for underground uranium mines prior to 1967, there is a record of considerable improvement in the average concentrations to which miners were exposed from 1937–1966.

During the 1967 hearings conducted by JCAE, an exchange between the Chairman of the committee and a Commissioner of

AEC demonstrated the long cumulative process involved in understanding and resolving the uranium mine problem (Tr. 1961; Pl.Ex. 115, pp. 175–176):

Representative HOLIFIELD. I recognize that my next question is going to bring up the ever-present conflict of jurisdiction between State and Federal Government, but laying that factor aside for the moment, and considering the AEC's expertise in the radiation field, do you think that maybe we could have handled this in a sounder way if the AEC had been charged with the responsibility of controlling radiation from uranium and radon mines from the beginning?

Mr. RAMEY. Mr. Chairman, I think hindsight is always a little easier in looking at things that way. It is true that AEC has a great deal of expertise in the radiation field. On the other hand, the Public Health Service, of course, has been the expert on the epidemiological studies. This has been recognized from the start. They have been doing a good job on this.

Mr. Holaday has been following this from the year 1, so we do not think that their role has been hurt at all in this sort of thing.

Representative HOLIFIELD. In other words, there has been expertise in the field applied to the problem over these years by the Public Health Service?

MR. RAMEY. Yes, sir; in that context.

I think, also, on the mining side as such, the AEC, again, does not have all of the expertise certainly on mining and mine ventilation, and so on. That is why we cooperated with the Bureau of Mines and, of course, with the State people in regard to leased mines. We did consider and do consider ourselves to have some expertise on the radiation aspects of it.

Representative HOLIFIELD. At least in the interpretation of radiation levels.

Mr. RAMEY. Yes. And we do in other areas, of course, at the mill level and with respect to reactors, with respect to radioisotopes, we do have a rather comprehensive regulatory program.

Representative HOLIFIELD. Can you say with confidence that the AEC has discharged its responsibility in the mine and laboratory in regard to safety from radiation?

Mr. RAMEY. Yes, and in terms of research we have been working on various aspects of research and development relating to dosimeters, relating to respirators, and this type of thing.

We recognize, I think, that perhaps we could have done some more. A number of us think that in hindsight we probably could have had a little more leadership on whether or not we had the authority to move these things a little faster.

Representative HOLIFIELD. *But we were accumulating knowledge in this field. I mean, the AEC, as well as the committee, has been accumulating knowledge in this field, and some of the latest knowledge that has come to us has been in the form of conclusions that have been long in the making.*

Mr. RAMEY. Yes, sir. The Joint Committee hearings in 1959, in which Mr. Holaday testified, brought up the uranium miner problem.

At that time, though, there had only been, as I recall, four deaths. *It was not clear from the HEW, Public Health Service epidemiological studies exactly how that trend was going to go. It began to become clearer, I think, in 1962 and 1963, as I recall,* that the trend was going to follow the same way that it had done in Europe in the Silesian mines and so on.

It was in this period in the mid-1960's where we could have probably moved a little faster. As you know, there were various other problems and factors involved that were being given priority attention; namely, fallout and related criteria. (Emphasis supplied)

Even as late as the 1967 JCAE hearings there was still disagreement among the witnesses and committee members as to the proper maximum radiation exposure

levels that should be set for the underground uranium mines as well as concern that Secretary Wirtz' levels were impractical and too high. (Def.Ex. 585; Pl.Ex. 115)

The U.S. BOM inspected uranium mines on the Navajo reservation pursuant to the Secretary of Interior's Order No. 1940, dated April 4, 1944. (Tr. 1092) The USGS had enforcement authority over uranium mines on the Navajo reservation and the BOM had inspection authority. (Def.Ex. 2288) Copies of the USGS Inspection Reports were sent to the Navajo Mining Engineer, an employee of the Navajo tribe. (Def.Ex. 2929) But the Department of Interior (BOM and USGS) had no legally established radiation exposure standards for underground uranium mines to enforce until they were established in 1967.

The State of Arizona also inspected mines on the Navajo reservation. State inspector, Anthony Bennett, has conducted inspections for dust and ventilation for the State of Arizona in uranium mines on the Navajo reservation since 1951. (Tr. 1379–1380)

The State of Arizona sent inspection reports to Duncan Holaday of the PHS, to the Navajo Tribal Council, to the Deputy Mine Inspector of the State of Arizona and to the superintendent of the actual mines. (Tr. 1382, 1385)

On two occasions, the Arizona Mine Inspector determined that there were hazardous dust conditions in uranium mines on the Navajo reservation. Although the Arizona inspector had no authority to issue closure orders, he notified a representative of the USGS who did have such enforcement authority. The USGS representative made an immediate inspection of the mines and issued closure orders pursuant to his authority. (Tr. 1390–1393, 1395–1396)

The Tribal Council is the legislative body that enacts the laws of the Navajo nation. (Tr. 564) Under the laws of the Navajo nation, the Navajo Mining Engineer, an employee of the tribe, had the authority to enter and inspect all mines on the Navajo reservation, as well as the authority to close mines located on the Navajo reserva-

tion to remedy any condition or practice which is a menace to life, limb, or health. The authority of the Navajo Mining Engineer to close mines existed whether or not there was a violation of any state or federal mining regulation. (Def.Ex. 2985; Tr. 578–579)

The BOM and the USGS notified the Navajo Mining Engineer of radon daughter readings in uranium mines on the Navajo reservation and the levels of free silica existing in such mines. Representatives of the BOM and USGS further indicated means of correcting any hazardous conditions that they found in such mines. (Tr. 582–588; Def.Ex. 2926, 2929, 2966)

Representatives of the United States, including employees of the PHS and BOM, met at various times with representatives of the Navajo tribe to discuss the radon concentrations in underground uranium mines on the Navajo reservation and to enlist the aid of the Navajo Mining Engineer to assist in making surveys therein. (Tr. 580–581; Def.Ex. 2568)

The weight of the evidence, including medical testimony, statistical data and historical events, leaves no doubt that there is a direct relationship between the high levels of radiation exposure suffered by the underground uranium miners and their excessive incidence of respiratory tract and lung cancer. The respiratory tract and lung cancers involved in this case were caused by excess exposure to radon daughters in the underground uranium mines. The one case of bladder cancer was not so caused.

## ADDITIONAL FINDINGS OF FACT

1. At the time of commencement of the U.S. Public Health Service study none of the western uranium mining states had trained personnel, equipment or other resources to establish, monitor and enforce maximum radiation exposure levels in their underground uranium mines. This was also true of the Navajo Mining Engineer. The State of Colorado moved rapidly to implement the developing recommendations

of the PHS and ultimately achieved a very effective control program. Utah and New Mexico were much less successful. The Arizona Mine Inspector had no legislative authority during the decade of the 1950's to establish or enforce maximum exposure levels of radiation. Other than making measurements of radiation levels for PHS in the late 1950's, he did nothing.

2. The Atomic Energy Commission had developed very effective radiation level controls in the mines owned by the mills with which it had procurement contracts. This information and the techniques used were available for all state and federal agencies. The Public Health Service, during all of the period of the 1950's, was disseminating information about radiation control by mine ventilation to the states, the Navajo Mining Engineer, and the mine operators. For whatever reason, other than Colorado, little or nothing was done by the states or the Navajo Mining Engineer to force the mine operators to improve ventilation in their mines. Although the PHS demonstrated that adequate mine ventilation would be relatively inexpensive, the mine operators successfully resisted efforts to substantially reduce radiation levels by improved ventilation techniques.

3. All during the decade of the 1950's the radiation exposures in some mines were found to be more than one thousand times the maximum working level recommended by the Public Health Service. These levels were higher than those in the European mines and even higher than the radiation doses received as a result of the atomic bomb explosions in Japan during World War II.

4. After the initial mine survey by PHS, federal government officials and decision makers in both the executive and legislative branches were aware of the continued excessively high radiation levels in the underground uranium mines as reported by PHS.

## LEGAL DISCUSSION AND CONCLUSIONS OF LAW

The plaintiffs generally complain that various governmental agencies were action-ably negligent in leaving uranium mine safety outside the Indian reservation to the state; were negligent in failing to enforce rigid radiation safety levels in the reservation mines; that the PHS study was a good samaritan undertaking negligently performed in that miners were not warned of possible radiation damage; and that all involved federal agencies were negligent in failing themselves to establish and enforce rigid radiation safety standards in the underground uranium mines in the 1940's, 1950's and early 1960's.

The government's main defenses are the discretionary function exception to the Federal Tort Claims Act (FTCA); the misrepresentation exception to the FTCA; that the PHS study was not a good samaritan undertaking; that the claims are time-barred; and lack of causation.

It is Hornbook law that the United States can be sued only to the extent that it has waived its immunity. *United States v. Orleans*, 425 U.S. 807, 813–814, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390 (1976). Waiver of sovereign immunity "cannot be implied." *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969). The statutes and regulations must be strictly construed. *Childers v. United States*, 442 F.2d 1299, 1303 (5th Cir.), *cert. den.*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 99 (1971); *Hurley v. United States*, 624 F.2d 93, 95 (10th Cir.1980).

In *United States v. Orleans, supra*, the Supreme Court unanimously reaffirmed the principle that "the Federal Tort Claims Act is a limited waiver of sovereign immunity" and that "[s]ince the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the [Act's] exceptions." 425 U.S. at 813–814, 96 S.Ct. at 1975–76.

The FTCA, 28 U.S.C. § 2674, provides in pertinent part:

The United States shall be liable, respecting the provisions of this title relat-

ing to tort claims, in the same manner and to the same extent as a private individual under like circumstances ....

The "discretionary function exception" is found in 28 U.S.C. § 2680(a):

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The leading case on the discretionary function exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). *Dalehite* involved claims arising from the cataclysmic explosion of shiploads of government fertilizer at Texas City, Texas. Plaintiffs claimed that numerous acts of the United States were negligent: the cabinet-level decision to institute the fertilizer export program; the failure to experiment with the fertilizer to determine the possibility of explosion; the drafting of the basic plan of manufacture; and the failure properly to police the storage and loading of the fertilizer. The Supreme Court held that the plaintiffs' claims against the United States were encompassed within the discretionary function exception. The Court stated:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for pol-

icy judgment and decision there is discretion.

*Id.* at 35–36, 73 S.Ct. at 968.

Until very recently, it was thought that *Dalehite* had been narrowed by *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). *See* Judge Jenkins' thorough discussion in *Allen v. United States*, 527 F.Supp. 476, 479–86 (D.Utah 1981). Indeed, plaintiffs in the cases *sub judice* rely heavily on *Indian Towing*.

In *Indian Towing*, plaintiff sought damages for cargo aboard a vessel that had run aground, allegedly owing to the failure of the Coast Guard to inspect, maintain, and repair a light in a lighthouse. In *Rayonier*, the Court "revisited an issue considered briefly in *Dalehite:* whether the United States may be held liable for the alleged negligence of its employees in fighting a fire." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, —— U.S. ——, ——, n. 10, 104 S.Ct. 2755, 2765 n. 10, 81 L.Ed.2d 660 (1984). In *Varig Airlines*, the Supreme Court distinguished *Indian Towing* and *Rayonier*. The Court explained that in *Indian Towing*

the Government *conceded* that the discretionary function was not implicated, ... arguing instead that the [Federal Tort Claims] Act contained an implied exception from liability for "uniquely governmental functions." The Court rejected the Government's assertion, reasoning that it would "push the courts into the 'non-governmental'—'governmental' quagmire that has long plagued the law of municipal corporations."

*Id.,* —— U.S. at ——, 104 S.Ct. at 2764 [citations omitted] [emphasis in original]. The Court also noted that in *Rayonier*, the Court had held that the liability of the United States under the FTCA is not restricted to that of a municipal corporation or other corporate body. This holding, while obviously overruling one element of the judgment in *Dalehite*, did not disturb the more fundamental aspects of *Dalehite*,

including its construction of § 2680(a). *Id.* at n. 10. Finally, the Court noted that, as in *Dalehite,*

> it is unnecessary—and indeed impossible to define with precision every contour of the discretionary function exception.

*Id.,* —— U.S. at ——, 104 S.Ct. at 2765.

The Court found it possible, however, to set forth several factors that are useful in determining when the acts of a government employee are protected from liability by § 2680(a).

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite,* the exception covers
>
> "[n]ot only agencies of government ... but all employees exercising discretion." Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.
>
> Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Id.* The Court applied these factors, and held that the discretionary function exception operated to bar suit for claims arising out of the allegedly negligent certification of aircraft by the Federal Aviation Administration. *Id.,* —— U.S. at ——, 104 S.Ct. at 2768.

■ Applying these factors to the cases *sub judice,*[2] this court concludes that the acts of the government officials in the instant cases are shielded from tort liability by the discretionary function exception. The "nature of the conduct" in the instant cases is of the type that Congress plainly intended to shield from tort liability.

Although the Supreme Court made it plain in *Varig Airlines* that it is the nature of the conduct, and not the status of the actor that is the critical factor, it also is true that "[t]he higher the governmental rank involved in making any decision of this type, the more likely it is that political, social, military and economic factors were weighed." *Nevin v. United States,* 696 F.2d 1229, 1231 (9th Cir.1983), *cert. den.,* —— U.S. ——, 104 S.Ct. 70, 78 L.Ed.2d 84. As reflected in the findings above, the decisions, the acts and omissions complained of, were made at the highest levels of the executive and legislative branches.

*State and Federal Responsibility for Mine Safety Enforcement*

Historically mine safety enforcement had been totally the responsibility of the individual states. The passage of the Coal Mine Safety Act in 1952 marked the first federal encroachment in this area. As the name implies, it was strictly limited to coal mines. It was not until 1966, partly as a result of the uranium mining experience, that the Metal and Nonmetallic Mine Safety Act was passed placing ultimate responsibility on the federal government for safety enforcement in all mines in the United States.

Pursuant to that historical political policy the executive and legislative branches early in the period of uranium mining on the Colorado plateau, and at the very highest levels, made conscious policy decisions to leave mine safety enforcement in the hands of the states. The federal government undertook only responsibility for research in this area, distribution of research data to the states and the making of recommendations to the states.

The evidence in this case as to meetings of high level government officials, conferences between uranium mining state governors and representatives of federal agencies, and transcripts and summaries of congressional committee hearings in the 1950's and early 1960's and even as late as the Joint Committee on Atomic Energy hearings in 1967 (Pl.Ex. 115), demonstrates the

---

**2.** *Varig Airlines* was decided subsequent to briefing and argument in the instant cases.

repeated iteration and concern for this history of state-federal responsibilities and the consciousness at all levels of this policy (*e.g.,* Pl.Ex. 115, p. 175). *Cf. Varig Airlines, supra,* —— U.S. at ——, 104 S.Ct. at 2768 ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind."). It necessarily follows that when high government officials determine the extent to which they will leave mine safety enforcement to the states, they are exercising discretionary authority "of the most basic kind."

*Indian Mines*

The federal government since 1944, through the Department of Interior and its Bureau of Mines and United States Geological Survey unit, retained mine safety enforcement only on Indian reservation mines. On the Navajo reservation mines in Arizona, the state mine inspector had authority to inspect for dust control but not for radiation exposure levels. For enforcement he had to rely on the USGS. After training by PHS, the Arizona Mine Dust Inspector did monitor radiation levels in Indian mines and provided data to PHS.

The U.S. Bureau of Mines had authority to check radiation levels in Indian uranium mines. However until 1967, no legally enforceable maximum radiation levels had been established. During all of the 1950's there were constant discussions at high levels marked by disputes as to what maximum levels of radon daughter concentrations should be established. There were no adequate or reliable dosimeters or other equipment developed until the mid and late 1960's to constantly monitor and record exposures of individual miners or in the mine environment itself. There were no adequate individual respirators for miners. The AEC had ongoing research and development projects in all these areas.

At the highest management levels, the BOM and USGS, as did the Department of Labor (Tr. 1952–54), made conscious decisions to take no direct actions in this area until legally enforceable and physically practical standards had been adopted by the federal government. *See, e.g., Barton v. United States,* 609 F.2d 977 (10th Cir. 1979); *Coastwise Packet Co., Inc. v. United States,* 398 F.2d 77, 79 (1st Cir.), *cert. den.* 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968); *Dalehite v. United States, supra,* 346 U.S. at 34, 73 S.Ct. at 967; *see also Relf v. United States,* 433 F.Supp. 423 (D.D.C.1977), *aff'd* 593 F.2d 1371 (D.C.Cir. 1979).

As stated in *Barton, supra,* at page 979:

Concisely stated, the rule is that if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception of the Tort Claims Act. Conversely, if there is a standard by which his action is measured, it is not within the exception. The statute provides that if the act of the official is discretionary it is not actionable even though the discretion is abused.

Until 1967 there were no such fixed standards. Prior to 1967, the PHS had recommended standards which were widely disseminated. The PHS urged the states to establish and enforce those standards. The PHS also urged mine operators on and off the Indian reservation to use mine ventilation techniques to try to achieve those recommended levels. Even in 1967, after Secretary Wirtz of the Department of Labor established standards, there were still high level fears that those regulations were unworkable. (Pl.Ex. 115; Def.Ex. 585)

The decisions regarding setting radiation standards required the agencies to balance "the objectives sought to be obtained against [the] practical consideration" that there was continuing dispute as to what levels of radon daughter concentrations should be adopted. *Cf. Varig Airlines, supra,* —— U.S. at ——, 104 S.Ct. at 2768. "Judicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an

agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent." *Id.*

The Surgeon General, in agreeing that PHS would conduct the epidemiological survey and in establishing the protocol for the study, including the determination not to warn the uranium miners of possible radiation damage, made a policy and planning decision that is immune from court review under the discretionary function provision of the FTCA. He also was acting pursuant to 42 U.S.C. § 216(b), under the authority of which, with the approval of the Secretary of HEW, 42 C.F.R. § 1.103 was duly promulgated and in force from 1951 through 1978.

This regulation, which governed the disclosure of information obtained and conclusions reached for PHS surveys, research projects and investigation, provided in relevant part:

§ 1.103 *Nonclinical information; disclosure.* (a) Information in the records or possession of the Service obtained by the Service under an assurance of confidentiality which the Surgeon General or his authorized representative determines to be necessary for the purpose of any research, survey, investigation, or collection of statistical data *may be disclosed only with the consent of the person, association, or agency to which such assurance was given,* or whenever the Surgeon General specifically determines disclosure to be necessary (1) to prevent an epidemic or other grave danger to the public health or (2) to oppose any legal action related to the activities of the Service and brought against the United States or any of its officers or employees.

\* \* \* \* \* \*

(c) The following types of information in the records or possession of the Service are confidential and, subject to the provisions of paragraphs (a) and (b) of this section, shall be disclosed only as necessary for the performance of the functions of the Service, or as follows:

\* \* \* \* \* \*

(2) *Information and data obtained* and tentative and final conclusions reached *in the course of* or in connection with the conduct of *research projects, surveys and investigations may be disclosed at such times and to such extent as the Surgeon General or his designee may determine to be in the public interest.* (Emphasis supplied)

The decision to *not do* something is just as much a policy decision as one to *do* something. 28 U.S.C. § 2860(a), second clause; *Barlieb v. Turner & Newall, Ltd.,* Civil No. 78–1027, slip opinion at 10–11, (E.D.Pa. Nov. 28, 1980) (PHS decision not to disseminate information about asbestos or to warn the plaintiffs of the dangers inherent in working near asbestos was a discretionary function and the complaint was dismissed as to PHS); *Relf v. United States, supra.*

Underlying all of the decisions of federal agencies complained of by plaintiffs were concerns as to balancing the risk of radiation-induced injury and the benefits derived from the practice causing exposure to the miner. *Cf. Varig Airlines, supra,* —— U.S. at ——, 104 S.Ct. at 2768 (balancing "objectives ... against practical considerations"). "An implicit part of such a balance is the necessity for considering the relation between the difficulties involved in reducing the radiation exposure by a given amount and the risk that might be associated with that amount of exposure." (Def.Ex. 2329)

The government, in making its decision in this area, was faced with the immediate need of a constant, uninterrupted and reliable flow of great quantities of uranium ore from the mines to the mills for urgent national security purposes and as an energy source in the future for the growing peacetime nuclear energy industry. Also

the decision makers had to be concerned that there was adequate data available to justify the standards to be set and that labor and management would have the tools to know when they were in violation (Tr. 1563–1572). Even in 1967 there was testimony before the JCAE that such tools were unavailable (Def.Ex. 115; Tr. 1565–1572).

At this point a hypothetical situation used by Judge Jenkins in *Allen v. United States,* No. C 79–0515–J (D.Utah 1984), to illustrate the extent of the discretionary function exception to the FTCA may be helpful in understanding the decision herein:

> Suppose a high level decision maker says, "International pressures make open-air atomic testing highly necessary. Time is of the essence. We cannot tell our own people. We just need to do it and do it as fast as we can. We know as a result of such testing some people are going to get hurt. We can't tell them they are going to get hurt. We can't even warn them what to do to minimize or prevent the hurt. In order to preserve our way of life some people unknown to them and unknown to us are going to give their all for the good of all."
>
> Policy decision? Yes. Tort Claims Act exception.
>
> Assuming appropriate power in the decision maker—a court, this court, would lack power to do anything at all about such a policy decision. Under that hypothetical, Congress, as a matter of conscience and not as a matter of legal duty would, it seems to me, recognize the equities and make redress as best it could.

(Slip opinion Civil at pp. 155–6). To the same effect, *see Nevin v. United States, supra.*

In *Nevin,* relatives of the deceased brought an FTCA claim alleging that decedent died as a result of the government's negligence in selecting a particular strain of bacterium for use in a secret, simulated biological warfare attack on City of San Francisco in 1950. The court held that the choice of the particular strain of bacterium used was a discretionary function and the government was immune from suit under FTCA.

The cases before this court are distinguishable from *Allen, supra,* a recent District Court decision which found for the plaintiffs in a nuclear bomb testing fallout case. There the decision to hold the test and where and when to hold it were discretionary functions and FTCA immune. However, as part of the implementing instructions for field personnel conducting the tests, very specific directions were given as to protection of residents of possible fall-out areas, including broad dissemination of warnings, education, safety precautions to be taken by persons in the fall-out area, etc. The field personnel, contrary to specific directions, did not warn; they reassured people that there would be no danger and failed in every respect to carry out their very detailed instructions as to protection of possible fall-out victims. Because of this negligence in carrying out a protected policy decision, the government was held liable for damages proximately caused by the fall-out.

In the cases *sub judice* the policy decisions, and especially the PHS study protocol, were carried out at the operational level in strict compliance with those exempt decisions. It therefore follows that the acts of the government employees in carrying out the policy decisions are protected by the discretionary function exception. *See Varig Airlines, supra,* —— U.S. at ——, 104 S.Ct. at 2768.

The court concludes that all the actions of various governmental agencies complained of by plaintiffs were the result of conscious policy decisions made at high government levels based on considerations of political and national security feasibility factors. All such decisions, including the PHS epidemiological study, were carried out as directed. Therefore this court lacks

subject matter jurisdiction to proceed in these cases. 28 U.S.C. § 2680(a); *Dalehite, supra; Nevin, supra,* 696 F.2d at 1231. Because the discretionary function exception is dispositive, there is no need to discuss the other legal theories of plaintiffs or defendant.

This tragedy of the nuclear age, however, cries for redress. Such relief should be addressed by the Congress as it was in the case of the Texas City explosion following the decision of the Supreme Court in *Dalehite, supra;* 69 Stat. 707; *see Laird v. Nelms,* 406 U.S. 797, 802–803, 92 S.Ct. 1899, 32 L.Ed.2d 499, *reh'g denied,* 409 U.S. 902, 93 S.Ct. 95, 34 L.Ed.2d 165 (1972); and as the Congress is currently considering in the Vietnam veterans Agent Orange cases.

IT IS ORDERED:

The complaints and actions of the selected plaintiffs which were tried in this severed trial are dismissed for lack of subject matter jurisdiction. The Clerk will enter judgment accordingly.

## APPENDIX A

### GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AEC | Atomic Energy Commission |
| BOM | United States Bureau of Mines, United States Department of the Interior |
| FRC | Federal Radiation Council |
| FTCA | Federal Tort Claims Act |
| HEW | United States Department of Health, Education and Welfare (now United States Department of Health and Human Services) |
| WL | "Working level." A measure of individual radiation exposure. |
| JCAE | Joint Committee on Atomic Energy |
| PHS | Public Health Service, Office of the Surgeon General, United States Department of Health, Education and Welfare (now United States Department of Health and Human Services) |
| USGS | United States Geological Survey, United States Department of the Interior |