John N. BEGAY and his wife, Mable Lee Begay; Kee Atcitty; Bob B. Begay and his wife, Mae Begay, et al., Plaintiffs/Appellants,

v.

UNITED STATES of America, Defendant/Appellee.

Phillip ANDERSON, Marry John Badoni, Hoskie R. Barton, Clyde Begay, Harvey Lee Begay and Herbert N. Begay, et al., Plaintiffs/Appellants,

v.

UNITED STATES of America, Defendant/Appellee.

No. 84–2462.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1985.

Aug. 13, 1985.

Stewart L. Udall, Phoenix, Ariz., for plaintiffs/appellants.

# 1060

Mark H. Gallant, Atty., Dept. of Justice, I. Avrum Fingeret, Trial Atty., U.S. Dept. of Energy, Washington, D.C., for defendant/appellee.

Before ANDERSON and CANBY, Circuit Judges, and IDEMAN *, District Judge.

J. BLAINE ANDERSON, Circuit Judge:

## I. OVERVIEW

The plaintiffs in this case are Navajo Indians residing on the reservation in Arizona. They are either Navajo miners who used to work in uranium mines or survivors of deceased Navajo uranium miners. The underground uranium mines involved in this case are located in Utah, Colorado, New Mexico, and Arizona, both on and off the Navajo Indian Reservation. More specifically, eleven plaintiffs were selected as a representative group for trial purposes out of more than 200 plaintiffs. The plaintiffs sought jurisdiction in the district court pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, et seq.

The plaintiffs allege that they contracted lung cancer and other diseases from radiation exposure because of the failure by the various federal and state agencies to warn them of the dangers involved in uranium mining. The plaintiffs additionally assert that the failure to warn the miners of the dangers of uranium mining unnecessarily exposed the miners to risks that could have been prevented. Plaintiffs also assert that this exposure resulted in the eventual death of some of the miners. The district court, after extensive discovery and a trial, dismissed the case for lack of jurisdiction based on the "discretionary function" exception of the FTCA, 28 U.S.C. § 2680(a).[1] We affirm.

## II. FACTS

The district court, in its opinion, *Begay v. United States*, 591 F.Supp. 991 (D.Ariz. 1984), sets forth a very thorough and comprehensive explanation of the factual background in this case. The agencies involved in this case are the Atomic Energy Commission (AEC), the U.S. Public Health Service (PHS), the AEC Division of Biology and Medicine, the Department of Interior's Bureau of Mines (BOM), the Los Alamos Scientific Laboratory, the Atomic Energy Project at the University of Rochester, the U.S. Department of Health and Welfare (HEW), the U.S. Surgeon General's Office, the U.S. Department of Labor, the U.S. Geological Survey (USGS), the Arizona Mine Inspector, and the Navajo Mining Engineer. Because the district court did such a thorough job in stating the facts in this controversy, we list only those facts that we find salient to resolving the issue before us.

Mining of ores bearing uranium-vanadium compositions was first started in the United States during the early 1900's. Most of these mines were located in what is called the Uravan Mineral Belt portion of the Colorado Plateau in western Colorado and eastern Utah. At first, mining of uranium ore was minimal and did not start to rapidly expand until the 1950's. This rapid increase in uranium mining was a result of the AEC's need for uranium in nuclear weapons production. Most uranium mines were smaller in size than other metal mines, but by 1966, approximately 2,900 miners were employed in uranium mines.

In August of 1949, the state of Colorado requested the help of the U.S. Public

---

* The Honorable James M. Ideman, United States District Judge, Central District of California, sitting by designation.

1. 2. Under 28 U.S.C. § 2680(a) [28 U.S.C.S. § 2680(a)], the United States may not be held liable under the Act for:

"Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Health Service to conduct a medical/environmental survey on the health hazards associated with uranium mining. The PHS survey was an epidemiological study which had two objectives: To determine the relationship between exposures to radioactivity and the biologic effect on miners, and to develop engineering methods to minimize the exposures to radioactivity and make those methods available to the state mine regulators and to the mining industry. The PHS received assistance on the project from the AEC Division of Biology and Medicine, the Department of Interior's Bureau of Mines, the Los Alamos Scientific Laboratory, and the Atomic Energy Project at the University of Rochester.

During the study, the PHS, as a part of HEW, was under the direct administration of the U.S. Surgeon General's Office. At no time did the PHS have the authority to regulate the safety conditions in the uranium mines. Likewise, the AEC had no authority under the Atomic Energy Act to regulate or enforce health and safety standards in mines. However, AEC did have the capability to influence the extent of safety equipment used in privately operated mines on government land leased from the AEC. This influence was exerted by rewriting the lease agreements between AEC and the owners of the private mines. By including certain requirements for safety equipment to be used in the mines as terms in the lease, AEC was able to indirectly regulate health and safety standards in the mines. The district court found that some of the other agencies did have, or perceived to have, some type of regulatory authority over the safe operation of the mines.

The Department of Labor did not conduct any inspections of the mines in question even though it was under the impression that it had some authorization to regulate mine safety pursuant to the Public Contracts Act. The district court found that Labor abstained from taking any action because of the prevailing view that other agencies, state or federal, could better set standards and enforce them.

The Department of Interior had authority to regulate mines located on Indian and public lands, but not private lands. The authority to inspect the mines, under the auspices of Interior, was given to the BOM and to the USGS in 1944. With regard to those powers, the district court found that the BOM and USGS did not have any clear federal standards by which to conduct their inspections. As a result, BOM and USGS sent copies of their reports of mine inspections to Arizona and to the Navajo Mining Engineer.

The Navajo Mining Engineer had the independent power to enter, inspect and close any mine on Navajo property. The Arizona Mine Inspector could inspect the mines, but could not order their closure.

With the scope of each agency's authority and power in mind, we look to the role of the PHS and their medical study. For purposes of the medical study the PHS established a cohort of miners, all volunteers, to whom they gave annual, then triennial, physical examinations. If test results from these physicals were abnormal, the miner was referred to local medical facilities for further treatment or study. In the case of the Navajo miners, referrals were sent to the PHS Indian Hospital. The PHS study team did not represent that it would provide health care to the members of the cohort.

When physical examinations were performed on Navajo miners who could not speak English, interpreters were provided. During the course of the physicals the miners were told that the examination was part of a study to determine the health of uranium miners. The district court stated that because an epidemiological study deals with group statistics, conclusions from the study cannot appropriately be applied to specific participants of a group. The district court also found that the PHS physicians conducting the examinations dealt only with that examination and its results, and that the conduct of the PHS doctors participating in the study and the limits of the information given to the miners studied was consistent with the medical, ethical

and legal standards of the 1940's and 1950's.

In 1951, the environmental side of the PHS survey determined that radiation decay products (daughter products) of radon contributed the greater portion of the radiation dose to the lung tissue. In 1959, for the first time, the results from the PHS study indicated a statistical increase above the number of expected deaths from lung cancer among miners. Although not conclusive, it was the first apparent evidence linking lung cancer and exposure to high concentrations of radon daughters. As a result, it was suggested to the Surgeon General that an interdepartmental conference be convened to determine what action, if any, the federal government was going to take in response to this statistical increase of lung cancer deaths in uranium miners.

The Interagency Committee recommended to the Secretary of HEW "that every effort should be made to impress upon the states the seriousness of this problem and the need to assume their rightful responsibilities" over regulation of mine health and safety conditions.

In 1960, a Governors' conference was called of the uranium mining states and the federal government offered its assistance in correcting the perceived health problems associated with uranium mining. Federal legislation that would preempt state laws and regulation concerning mining safety was something that neither the states nor the federal government wanted. Historically, the state governments had felt the regulation of mine health and safety was a matter of state business. At the same time, however, federal assistance, both financial and technical, was desired to help solve the radon daughter problem.

Colorado and New Mexico did begin to regulate mine operations in the early 1960's based on the PHS recommendations as to the radiation exposure limits. However, not until 1967 was a uniform federal radiation standard for underground uranium mining established and implemented.

### III. ANALYSIS

The gist of the plaintiffs' complaint falls into two general categories. First, that various federal agencies were negligent in failing to establish and enforce radiation safety standards in underground uranium mines when the dangers were first discovered. Second, that the PHS medical study done on the uranium miners within the cohort was a "good samaritan" undertaking, nonetheless done negligently, because the miners were not warned of the possible dangers of radiation exposure to their bodies.

The government's defense is the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

■ On review, we are guided by two principles for determination of this case. First, "[f]indings of fact [of the district court] shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). Second, "[i]f, ... the question requires ... [the appellate court] to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo." *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Resolution of the issues in this case is dependent on our construction and application of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) and *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). This is also our first opportunity to apply *Varig* to a case not involving strictly "regulatory" action of an agency.[2]

---

**2.** In the past, we have used the planning level/operational level dichotomy when analyzing the application of the discretionary function exception. *See Nevin v. United States,* 696 F.2d 1229 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 70, 78 L.Ed.2d 84 (1983); *Olsen v.*

## IV. APPLICATION OF VARIG

The underlying policy of the FTCA has been one of diminishing the immunity from suit of the federal government while at the same time spreading the economic loss suffered by the individual plaintiff. *See generally Indian Towing v. United States,* 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955); *Payton v. United States,* 636 F.2d 132, 144 (5th Cir.1981); *Downs v. United States,* 522 F.2d 990, 998 (6th Cir. 1975); *Smith v. United States,* 375 F.2d 243, 248 (5th Cir.1967). The federal courts have achieved the "spreading of the loss of the plaintiff," but not without great difficulty in determining when the discretionary function exception should or should not apply. *See* 35 Am.Jur.2d *Federal Tort Claims Act* §§ 15–36 (1967 & Supp.1984).

*Dalehite* described the discretionary function as "more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. *It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."* *Dalehite,* 346 U.S. 35, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (citations omitted) (emphasis added). Coinciding with the immunity afforded to subordinates when carrying out the decisions of higher officials, the discretion of those officials themselves is protected. "It is the discretion of the executive or the administrator *to act according to one's judgment of the best course,* a concept of substantial historical ancestry in American law." *Id.* at 34,

73 S.Ct. at 967 (citation omitted) (emphasis added).

The decision of the Supreme Court in *Varig,* rejecting an argument that *Dalehite* no longer represented "a valid interpretation of the discretionary function exception," identified several factors the courts should consider when deciding whether the discretionary function exception should apply. *Varig,* —— U.S. at ——, 104 S.Ct. at 2764, 81 L.Ed.2d at 673.

*Varig* involved suits against the United States alleging that the Civil Aeronautics Agency had been negligent in inspecting certain aircraft modifications. It was alleged that faulty modifications to the airplanes resulted in, or contributed to, the ultimate crash of each plane and loss of lives. Reversing this circuit's decision which allowed the plaintiffs to recover under the "good samaritan" rule of California, the Supreme Court held that the discretionary function exception of the FTCA barred the suit. *Varig,* at ——, ——, 104 S.Ct. at 2759, 2769, 81 L.Ed.2d at 667, 679.

 The plaintiffs in this case argue that *Varig* should only apply to regulatory decisions made by federal agencies. We disagree. *Varig* dealt with facts involving regulatory activities, but it is clear from the legislative history quoted and relied upon by *Varig* that limiting its application to regulatory decisions is inappropriate.

"It is neither desirable nor intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act should be tested through the medium of a damage suit for tort. *The same holds true of other administrative action not of a regulatory nature, such as the ex-*

---

*Mexico,* 729 F.2d 641 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984); *Grunnet v. United States,* 730 F.2d 573 (9th Cir. 1984). Courts and commentators have stated that the use of the planning level/operational level distinction is either two simplistic, or too complicated and specious. *See generally Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); Note, *The Discretionary Function Exception: Is it a Bar to Federal Jurisdiction?,* 1983

Utah L.Rev. 117 (1983); Note, *Federal Tort Claims Act: The Development and Application of the Discretionary Function Exemption,* 13 Cum. L.Rev. 535 (1982/1983).

In recognition of the problems that surround the application of the discretionary function exception, and in light of the Supreme Court's recent decision in *Varig,* we believe that the proper approach to determining when the exception applies is for the court to look to the nature of the conduct in question.

*penditure of Federal funds, the execution of a Federal project and the like."* *Varig,* at ——, 104 S.Ct. at 2763, 81 L.Ed.2d at 672 (citation omitted) (emphasis added). *Dalehite* also makes it clear that "it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function." 346 U.S. at 28, 73 S.Ct. at 964 (footnote omitted). Thus, the congressional intent of the discretionary function exception shows that its application is not relegated to strictly regulatory actions of the agencies involved. Non-regulatory acts, like the ones in question here, fall within the framework of the exception as Congress has intended.

In *Varig,* the Supreme Court determined that courts should give due regard to the following factors when deciding if the discretionary function exception should apply. First,

> it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.... Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*Varig,* —— U.S. at ——, 104 S.Ct. at 2765, 81 L.Ed.2d at 674. This consideration applies to "all employees exercising discretion." *Dalehite,* 346 U.S. at 33, 73 S.Ct. at 966.

Second, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Therefore, if judicial review would encroach upon this type of balancing done by an agency, then the exception would apply. *Varig,* —— U.S. at ——, ——, 104 S.Ct. at 2764, 2768, 81 L.Ed.2d at 674, 678. The question whether review is appropriate at this stage involves certain considerations of the separation of powers. *Allen v. United States,* 527

F.Supp. 476, 483, 485 (D.Utah 1981) ("[O]ne must understand that the words 'discretionary function' as used in the Tort Claims Act, are really the correlative, the other side of the coin, of the exercise of executive power."). *See generally* Note, *The Discretionary Function Exception: Is it a Bar to Federal Jurisdiction?,* 1983 Utah L.Rev. 177. *See also Allen, supra.*

As *Varig* points out, the exception applies when the agency makes a decision that is grounded in social, economic, and political policy. This is the very reason that the exception was passed. Congress wanted to prevent the courts from deciding in tort actions the policy and regulatory types of decisions that have been delegated to the agencies.

### A. Nature of the Conduct

■ Some of the agencies involved in this case did have some type of authority to regulate activity in the mines. These agencies, the Department of Labor (under the Public Contracts Act), the Department of Interior (regulations on Indian or public lands), the BOM, the USGS (both working under Interior), the Arizona Mine Inspector, and the Navajo Mine Inspector, chose to either implement safety regulations in the uranium mines, or not to. These decisions are clearly within the ambit of the Supreme Court's decision in *Varig* covering regulatory agencies. "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig,* —— U.S. at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678.

Our inquiry proceeds to the decision of the Public Health Service, acting under the Surgeon General, not to disclose to the miners the possible health hazards involved in working in the uranium mines. At the time, in order to get the cooperation of the owners of the various mines and to retain the members of the cohort for study, PHS decided not to warn the miners of the possible radiation hazards associated with uranium mining. *Begay,* 591 F.Supp. at 995. The decision not to warn the Navajo miners

was apparently made by Holaday, who at the time of the investigation was the Chief of PHS's Western Area Field Station in charge of research in 15 states. Holaday was also in charge of the environmental stage of the study of uranium miners involved here.

We find that the decision reached by Holaday, not to disclose the possible dangers of uranium mining to the miners, was based on his judgment of what the best course of action was under the existing circumstances. *See Dalehite,* 346 U.S. at 34, 73 S.Ct. at 967 ("The 'discretion' protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course....") (citations omitted).

B. *Social, Economic, or Political Policy Decision*

We also consider whether or not judicial review of the agency decision encroaches on the traditional discretionary powers of the executive branch. In this regard, the Office of the Surgeon General was acting "with the approval of the Secretary of HEW, [and] 42 C.F.R. § 1.103 [which] was duly promulgated and in force from 1951 through 1978." *Begay,* 591 F.Supp. at 1011. HEW is a cabinet level executive agency which includes the Surgeon General's Office. The regulation, 42 C.F.R. § 1.103(c)(2), states the following:

2) *Information and data obtained* and tentative and final conclusions reached *in the course of* or in connection with the conduct of *research projects, surveys and investigations may be disclosed at such times and to such extent as the Surgeon General or his designee may*

*determine to be in the public interest* (Emphasis supplied).

The decision not to release information taken from the study done by the PHS, under the Surgeon General's authority, is the type of decision covered by the exception. A review of that decision by this court would be an encroachment into the decision-making process of the executive branch which we decline to undertake. *See Varig,* 104 S.Ct. at 2765.

As we outlined above, if the decision by the agency is based on social, economic, or political policy considerations, then review by the court would consist of judicial second-guessing of the agency decision. Section 1.103(c)(2) expressly states that the Surgeon General or his designee may decide, *if in the public interest,* not to disclose certain information. Such a decision is discretionary by its very nature.

It is now well known that "there is a direct relationship between the high levels of radiation exposure suffered by the underground uranium miners and their excessive incidence of respiratory tract and lung cancer." *Begay,* 591 F.Supp. at 1006. At the time of the PHS study, however, the extent of danger in uranium mining was not known. In order to continue that study, a discretionary decision not to warn the miners of the possible radiation dangers of uranium mining was made.[3]

The PHS and the other federal and state agencies hypothesized that exposure to radiation in the uranium mines may have presented a danger to the miners. After 1959, the statistical data also indicated that the danger was present. The PHS staff, limited in both funds and authority, still did not warn the miners of the increasing evidence of radiation danger in the uranium

---

**3.** We believe that the decision here exemplifies the type of decision in the hypothetical given by the district court below.

Suppose a high-level decision maker says, 'International pressures make open-air atomic testing highly necessary. Time is of the essence. We know as a result of such testing some people are going to get hurt. We can't tell them they are going to get hurt. We can't even warn them what to do to minimize or

prevent the hurt. In order to preserve our way of life some people unknown to them and unknown to us are going to give all for the good of all.'

Policy decision? Yes. Tort Claims Act exception.

*Allen v. United States,* No. C 79–0515–J, slip op. at pp. 155–6 (D.Utah 1984). *Begay,* 591 F.Supp. at 1012.

mines. *Begay*, 591 F.Supp: at 995. Even though it may have been suspected by the PHS that some miners would suffer injury from radiation exposure, the goal of the study was to determine the extent of the hazards so that recommendations could be made and standards promulgated. This type of decision, one not to warn, was clearly the type of decision of an agency which Congress sought to protect from judicial review under the Tort Claims Act.

CONCLUSION

The analysis of the factors we have presented in this case shows that the decision of the Public Health Service not to warn the plaintiffs of the radiation dangers they were exposed to, is clearly within the ambit of the discretionary function exception, 28 U.S.C. § 2680(a). We agree with the district court that this is the type of case that cries out for redress, but the courts are not able to give it; Congress is the appropriate source in this instance.

The judgment of the district court is AFFIRMED.