**Daniel HAGY, individually and as Personal Representative of the Estate of Tracia Hagy, deceased, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. C96–1181WD.**

United States District Court, W.D. Washington.

May 6, 1997.

Craig E. Kastner, Law Offices of Craig E. Kastner, Issaquah, WA, Joel D. Cunningham, Luvera, Barnett, Brindley, Beninger & Cunningham, Seattle, WA, for Daniel Hagy.

Philip H. Lynch, U.S. Atty's Office, Seattle, WA, Elizabeth A. Russell, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, for U.S.

Elizabeth K. Reeve, Robert F. Kehoe, Schwabe, Williamson, Ferguson & Burdell, Seattle, WA, for State of Maryland, Habor General Hosp.

## ORDER ON MOTION OF DEFENDANT UNITED STATES FOR DISMISSAL PURSUANT TO FED.R.CIV.P. 12(b)(1)

DWYER, District Judge.

Plaintiff Daniel Hagy has sued the United States for the wrongful death of his wife Tracia. Tracia allegedly contracted a fatal neurological disease, known as Creutzfeldt–Jakob Disease, from contaminated human-growth-hormone treatments she received as a child. Her doctor allegedly obtained the contaminated material from a government-funded program. The United States has moved to dismiss for lack of jurisdiction.[1] No party has requested oral argument, and none is necessary.

---

1. The lawsuit also names the Johns Hopkins University School of Medicine, the State of Maryland, Harbor General Hospital, and ten John Doe physicians as defendants. The University of Ma-ryland was originally named as a defendant, but has since been dismissed without prejudice. See Dkt. # 27. The present motion involves only the United States.

## BACKGROUND

The human pituitary gland produces a hormone known as hGH. A deficiency of hGH during childhood results in hypopituitary dwarfism, which can be treated by hormone replacement. Until 1985, when the FDA approved the use of biosynthetic hGH, human pituitaries were the only source of hGH.

In 1963, the National Institute of Health (NIH) awarded Johns Hopkins University School of Medicine a cost-reimbursement contract, which provided funding for the establishment of the National Pituitary Agency. The Agency coordinated the collection of pituitaries and the extraction of hGH, and distributed hGH to "investigating" physicians throughout the country for use in the treatment of hGH-deficient children. The actual extraction and purification of hGH was done by several outside scientists, who also received funds from the NIH through research grants awarded to their respective universities. In 1967, the University of Maryland was awarded a similar contract to carry on the Agency's work. The University of Maryland operated the Agency, which was eventually renamed the "National Hormone and Pituitary Program" (NHPP), until 1992.[2]

Tracia Hagy received hGH treatments from an investigating physician at the University of California at San Francisco (UCSF) between 1975 and 1977. In 1993, Tracia died from Creutzfeldt–Jakob Disease. She allegedly contracted the disease from contaminated hGH treatments she received at UCSF.

Tracia's surviving husband, Daniel, brings this action for wrongful death against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. He claims that the government is liable for having provided UCSF with the contaminated hGH, and for having failed to discover and warn of the danger the hGH treatments posed to recipients. The United States has moved to dismiss, contending that plaintiff's claims fall within exceptions to the FTCA's general waiver of sovereign immunity.

## DISCUSSION

■■■ The Federal Tort Claims Act is a limited waiver of sovereign immunity, rendering the United States liable to the same extent as a private party for certain torts of federal employees. 28 U.S.C. § 1346(b). The question of whether a plaintiff's claims fall within the scope of the waiver is one of subject matter jurisdiction. In that regard, no presumptive truthfulness attaches to the facts alleged in the complaint. *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir. 1989). Rather, in determining whether it has jurisdiction, the court may review evidence beyond the pleadings and resolve factual disputes where necessary, so long as those factual disputes are not "so intertwined with the merits that their resolution depends on the resolution of the merits." *Careau Group v. United Farm Workers of America,* 940 F.2d 1291, 1293 (9th Cir.1991). The material jurisdictional facts in this case are not intertwined in that way, and are substantially undisputed.

■■■ Plaintiff bears the initial burden of pleading claims that fall within the FTCA's limited waiver of immunity. *Prescott v. United States,* 973 F.2d 696, 701 (9th Cir. 1992). He has satisfied that burden by alleging that the NIH negligently provided the contaminated hGH to UCSF. See First Amended Complaint, Dkt. # 10, at ¶ 6.4. He has also alleged that the United States is subject to liability for its negligent failure to discover and/or warn of the danger posed to hGH recipients. *See id.* at ¶ 7.1(3).

[5] The government bears the burden of proving that the plaintiff's claims fall within an exception to the FTCA. *Prescott,* 973 F.2d at 702. Here, the government contends that each alleged jurisdictional basis falls before a different FTCA exception. First, the government argues that it cannot be held liable for providing UCSF with contaminated hGH because the hGH in question came from an independent contractor, not from the government. Second, the government says it can-

---

**2.** In 1977, Harbor General Hospital was awarded a cost-reimbursement contract for the extraction and purification of hGH, which it provided to the NHPP. The NHPP stopped distributing hGH in 1985.

not be held liable for an alleged failure to investigate and warn because any such failure would fall within the FTCA's "discretionary function" exception. Alternatively, the government argues that plaintiff's direct negligence claim should be dismissed because, under Maryland tort law, the United States had no duty to discover or warn of the alleged danger posed by the treatments.[3]

## A. The "Independent Contractor" Exception

Although Plaintiff alleges in his complaint that the contaminated hGH came from the NIH, the government has submitted evidence, and plaintiff does not dispute, that the hGH in question came from the NHPP, not the NIH. See Tolman Dec. at ¶¶ 10–11. The government argues that it cannot be held liable for the negligence of the NHPP or the hGH extractors because it has not waived immunity for the torts of government contractors. Plaintiff counters that the NHPP was the NIH for purposes of the FTCA.

■ The FTCA's definition of "government employee" includes officers and employees of federal agencies, but excludes "any contractor with the United States." 28 U.S.C. § 2671; *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976). Government contractors, such as the NHPP, or grantees, such as the hGH extractors, are federal agencies for purposes of the FTCA only if "the government had the authority to control the detailed physical performance of the contractor and exercised substantial supervision over their day-to-day activities." *Laurence v. Dept. of Navy*, 59 F.3d 112, 113 (9th Cir.1995) (citing *Orleans*, 425 U.S. at 814–15, 96 S.Ct. at 1975–76).

■ The United States has submitted evidence that the NIH had no such authority and exercised no such control over the NHPP or the hGH extractors. Dr. Condliffe, the NIH's project officer for the NHPP from 1972–75, and Dr. Tolman, Dr. Condliffe's successor, have both explained that their duties were limited to monitoring the

work at the NHPP. Condliffe Dep. at 8:8–12; Tolman Dep. at 34:12–35:14; Tolman Dec. at p. 4 ¶ 10. In his deposition, Dr. Tolman described his monitoring duties as follows:

> I read progress reports, sometimes performed site visits to make sure that things seemed to be going all right, and if there were any comments from any of the investigators that were getting the material, why, of course, I would listen to what they had to say and so forth, but that was … the way I monitored.

Tolman Dep. at 34:14–20; *see also* Tolman Dec. at p. 4 ¶ 10 ("I monitored work progress, evaluated work performance and participated in decisions regarding disposition of funds, all in order to assure that the work was being performed efficiently and in accordance with the contracts."). Tolman affirmed that his duties were similarly limited with regard to the hGH extractors. Tolman Dec. at p. 5 ¶ 11. Such monitoring duties are not the sort of substantial, day-to-day government supervision necessary to convert a government contractor into a federal agency for purposes of the FTCA.

■ Plaintiff argues that the requisite amount of government control is demonstrated by the fact that the NIH "put an immediate stop to the program" when it discovered an hGH recipient had contracted Creutzfeldt–Jakob Disease. But as Drs. Tolman and Condliffe explained in their depositions, the NIH could do no more than stop funding the program; it could not prevent the NHPP from continuing its program with private funds. *See* Tolman Dep. at 29:4–22; 37:6–17; Condliffe Dep. at 25:8–26:6. "[T]he granting of funds can be conditional without changing the basic relationship" between the federal government and its contractors and grantees. *Orleans*, 425 U.S. at 816 n. 6, 96 S.Ct. at 1977 n. 6. Further, the relevant question is not whether the NIH had the authority to shut down the NHPP, but whether the NIH exercised substantial control over the NHPP's daily activities. The United States has established that the NIH exercised no such

---

**3.** The NIH is located in Maryland. Plaintiff's direct negligence claims are thus governed by Maryland law. 28 U.S.C. § 1346(b).

control, even if the NIH did have the authority to shut the NHPP down.

■ Plaintiff also relies on numerous statutes and regulations for his claim that the NIH exercised the requisite amount of control over the NHPP. This reliance is misplaced. The government's "ability to compel [a contractor's] compliance with federal regulation does not change a contractor's personnel into federal employees." *Letnes v. United States,* 820 F.2d 1517, 1519 (9th Cir.1987). The question is not whether the contractor "receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Orleans,* 425 U.S. at 815, 96 S.Ct. at 1976.

The government has submitted evidence establishing that the NIH did not supervise or direct the daily activities of either the NHPP or the hGH extractors. Plaintiff has introduced no evidence to the contrary. The independent contractor exception applies—the government cannot be held vicariously liable for the negligence of the NHPP or the hGH extractors.

Plaintiff's request for additional discovery on the issue of governmental control of the NHPP is denied. The court has already granted one such request, *see* Dkt. # 20, and plaintiff unearthed no evidence of government control warranting further discovery.

**B. The "Discretionary Function" Exception**

■ Plaintiff argues that even if the United States is not subject to suit for the negligence of the NHPP or the hGH extractors, it may be sued for its own negligent failure to (1) discover or (2) warn of the risks associated with the use of hGH. Plaintiff correctly argues that such a claim is not barred by the independent contractor exception. The government contends, however, that these jurisdictional bases for plaintiff's suit are invalidated by the "discretionary function" exception to the FTCA.

■ 28 U.S.C. § 2680(a) provides, in pertinent part, that the United States is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This portion of section 2680(a), known as the "discretionary function" exception, "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988).

■ The Supreme Court has articulated a two-part test for determining whether the discretionary function exception shields the United States from liability for a particular act or omission of a government employee. First, the exception only applies to acts that are discretionary in nature. *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991). If the challenged act is prescribed, the exception does not apply. *Id.* Second, the discretionary decision must be "of the kind that the discretionary function exception was designed to shield"—that is, a governmental decision "based on considerations of public policy." *Id.* at 322–23, 111 S.Ct. at 1274.

**1. Failure to Discover the Danger**

■ The NIH "failed to discover the danger" because it never undertook responsibility for investigating but, instead, left the responsibility for determining the risks of treating children with hGH with the NHPP. *See* Tolman Dep. at 20:15–21:3, 32:1–33:3; Condliffe Dep. at 13:25–14:17. The government contends that no statute, regulation or contract term proscribed such a decision or prescribed a different course of conduct, and plaintiff points to none. The decision was thus discretionary. The first part is satisfied.

As to the second part, the NIH's decision to delegate safety and warning responsibilities to the NHPP is the type of policy decision the discretionary function exception was designed to shield. Such a decision requires the agency "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations

as staffing and funding." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 820, 104 S.Ct. 2755, 2767, 81 L.Ed.2d 660 (1984). In light of such practical considerations, an agency may determine that operational safety will be enhanced through reliance on the contractor's special expertise. *See Duff v. United States*, 999 F.2d 1280, 1281 (8th Cir. 1993) (decision to delegate safety issues to contractor grounded in policy because the decision allowed government "to take advantage of a contractor's special expertise, thereby creating the opportunity for a safer, more efficient operation."); *Layton v. United States*, 984 F.2d 1496, 1502–03 (8th Cir.1993) (delegation of safety responsibility to contractor covered by exception). The discretionary function exception was designed to prevent judicial second-guessing of such policy decisions through tort actions. *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2764–65. The second part of the test is satisfied.

Plaintiff argues that the discretionary function exception "does not apply to decisions and actions regarding medical treatment." He relies on cases holding that the exception does not apply where "only professional, non-governmental discretion is at issue." *Lather v. Beadle County*, 879 F.2d 365, 367 (8th Cir.1989) (allegedly negligent medical judgment not covered by exception); *see Collazo v. United States*, 850 F.2d 1, 2 (1st Cir.1988) (same). This line of argument fails because the decision here—*whether* to take responsibility for safety matters—is a governmental decision, not a medical one.

Plaintiff also cites *Berkovitz* for the proposition that "the discretionary function exception does not shield decisions whereby 'the government creates a dangerous medical risk by approving the release of a drug or other treatment which causes harm.' " But *Berkovitz* does not stand for that. In that case, the plaintiff alleged that the government agency failed to comply with a specific mandatory directive to review data and test all polio vaccine lots before release to the public. *See* 486 U.S. 531, 547, 108 S.Ct. 1954, 1964, 100 L.Ed.2d 531 (1988). Because the decision to test was non-discretionary, the discretionary function exception did not shield the

government from liability. *Id.* at 547–48, 108 S.Ct. at 1964–65. Plaintiff does not allege violation of a mandatory directive.

■ "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines*, 467 U.S. at 819–20, 104 S.Ct. at 2767. Consequently, the court is without jurisdiction over plaintiff's claim that the United States is liable for its allegedly negligent failure to discover the danger.

### 2. Failure to Warn

■ Plaintiff's alternative claim—that the NIH knew of the danger and failed to warn of it—is subject to a similar analysis. First, plaintiff points to no directive requiring such a warning and the government submits that there is none. Any decision not to warn was thus discretionary. Again, the first part of the test is satisfied.

As to the second part, any decision not to warn the public of a danger posed by hGH is by nature policy-laden. The question of whether to take on the task of warning the public of such health dangers raises the same staffing and resource concerns as that of whether to investigate for risks; either action would require a substantial commitment of resources. Further, the decision to warn or not to warn in such a situation involves, among other considerations, balancing the importance of the given activity against the risks, if any, posed to the subjects. *See Begay v. United States*, 768 F.2d 1059, 1065 (9th Cir.1985) (decision not to warn uranium miners of danger of radiation exposure, even after risks had become known, covered by exception). The decision to warn or not to warn is susceptible to policy analysis. The second part of the test is thus satisfied, and this court is without jurisdiction to hear plaintiff's failure to warn claim.

Plaintiff argues that "[w]hile the precise manner and degree to which the public should be warned may involve a degree of discretionary judgment, the decision not to warn at all as to an obvious danger is not." The question, however, is not whether the

danger was obvious, but whether the decision to issue a warning or not is susceptible to policy analysis. Plaintiff relies on cases where the court determined that the particular decision not to warn was not susceptible to such analysis. *See, e.g., Schmoldt v. Wadco Industries, Inc.,* 941 F.Supp. 905, 909 (D.Ariz.1996) (failure to warn contractor of safety violation not policy based); *Marin v. United States,* 814 F.Supp. 1468, 1483 (decision not to warn known intended victim or local police of release of informant from custody not subject to policy analysis). 'Here, the decision not to warn the public of the danger of hGH treatments—assuming such a decision was made—is susceptible to policy analysis. Because there was no directive prescribing a different course of conduct, the discretionary function exception applies.[4]

Finally, plaintiff argues that a trial is necessary because the question of whether the discretionary function exception applies is "highly fact specific." But there are no material issues of fact remaining. Plaintiff concedes that no directive required particular government actions in this case, and the government has demonstrated that the decisions at issue are subject to policy analysis. That is sufficient to show lack of jurisdiction. *Lesoeur v. United States,* 21 F.3d 965, 967–68 (9th Cir.1994) (government need only prove that decision is subject to policy analysis, not that it actually balanced factors).

### CONCLUSION

The United States cannot be held liable for the negligence of either the NHPP or the hGH extractors because it has not waived immunity for the torts of its contractors and grantees. The discretionary function exception prevents the FTCA from being applied to hold the United States liable for its own alleged failure to discover the danger of using human hGH to treat dwarfism, or for an alleged failure to warn the public of it. For the reasons stated, the court is without jurisdiction under the FTCA, and the motion of defendant United States for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is granted.

---

4. Because the discretionary function exception applies, the court need not reach the issue of whether plaintiff's direct negligence claims are cognizable under applicable state law.